Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market Street, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Emanuella J. Paulos, SBN 276638
epaulos@levinlaw.com
LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
BUCHANAN, O'BRIEN, BARR, MOUGEY, P.A.
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: (850) 435-7000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| M.F., B.F., and A.F.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>META PLATFORMS, INC., formerly known as FACEBOOK, INC.<br><br>                    Defendant. | CASE NO.<br><br>COMPLAINT FOR PERSONAL INJURIES, AND FOR VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§17200, *ET. SEQ*<br><br>JURY DEMAND |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions."

*Protecting Youth Mental Health*, United States Surgeon General Advisory, December 7, 2021.

Plaintiffs M.F., on behalf of himself and as next of friend to his minor child, A.F., and B.F. bring this action for personal injury against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), doing business as Instagram ("Instagram") and allege as follows:

## I.     INTRODUCTION

1.      This product liability action seeks to hold Defendant Meta's Instagram product responsible for causing and contributing to the burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Meta and, specifically, for personal injuries it caused Plaintiffs M.F. and B.F. and their minor child A.F. starting when A.F. was only 9 or 10 years old. Those injuries, proximately caused by Meta's calculated business decisions and unreasonably dangerous Instagram product, include but are not limited to, addiction, sleep deprivation, anxiety, depression, self-harm, suicidal ideation, and extensive exploitation and abuse carried out because of and to the benefit of Defendant Meta.

2.      Plaintiffs' harms were all caused by A.F.'s exposure to and use of Meta's unreasonably dangerous and defective social media product, Instagram. A.F. was 9 or 10 when she first began using Instagram, without her parents' knowledge or consent. Meta not only knew that A.F. was under the age of 13, it affirmatively recommended her profile to adult, strangers (sexual predators who wrote and told her that they found her through Meta's recommendation feature), made her available to those strangers via its direct messaging and similar products, knew or recklessly disregarded the fact that she was contacted by and engaged in extensive live, video, and photo exchanges with countless adult Instagram users. Even now, Meta has not taken down A.F.'s public profile which reads,

**"10 year old who isn't allowed to be on social media"**

Which is what A.F.'s father wrote almost a year ago after discovering A.F.'s Instagram account. This is not the only Instagram account for which A.F.'s parents blocked access by their 10-year-old child, nor will it be the last given Meta's design and distribution decisions.

3.      On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. The most significant

and far-reaching change to the lives of young people during this time was the launch and light speed growth of certain social media products, most prominently for purposes of this case the Instagram product, designed and distributed by Meta.

4.    In Meta's own words, it created with its Instagram product a "perfect storm" of addiction, social comparison, and exposure to incredibly harmful content and product features. Meta programmed and operated its product to prioritize engagement over user safety, and A.F. suffered several emotional and physical harms as a result.

5.    Instagram is causing these harms, which comes as no surprise to Meta. From the beginning, Meta exploited vulnerabilities in human psychology to addict users (particularly minor users) and to maximize user time and engagement. Meta's first President, Sean Parker, summed up the devastating impact of these social media designs in a 2017 interview:

> God only knows what it's doing to our children's brains. The thought process that went into building these applications, Facebook being the first of them, ... was all about: "How do we consume as much of your time and conscious attention as possible?" And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content, and that's going to get you ... more likes and comments. It's a social-validation feedback loop ... exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators — it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's all of these people — understood this consciously. And we did it anyway.[1]

6.    Meta has operated for years under the fiction that it is untouchable and with the goal of exercising control over the entirety of America's youth – which allegation is proven by Meta's own records and testimony of former employees. Meta's founder, Chairman, CEO, and controlling stockholder, Mark Zuckerberg, used to end company meetings with the exhortation "Domination!"[2] and is coming shockingly close to accomplishing that goal.  For example, a recent

---

[1] Mike Allen, *Sean Parker unloads on Facebook: "God only knows what it's doing to our children's brains"*, Axios (November 9, 2017), https://www.axios.com/2017/12/15/sean-parker-unloads-on-facebook-god-only-knows-what-its-doing-to-our-childrens-brains-1513306792.

[2] Evan Osnos, *Can Mark Zuckerberg Fix Facebook Before It Breaks Democracy?*, THE NEW YORKER (Sept. 10, 2018); *see also, e.g.*, See, e.g., Kate Losse, *THE BOY KINGS: A JOURNEY INTO THE HEART OF THE SOCIAL NETWORK* (2012); Renee M. Jones, *The Unicorn Governance Trap*, 166 U. PA. L. REV.  ONLINE  165, 186-87  (2017), http://www.pennlawreview.com/online/166-U-Pa-L-Rev-Online-165.pdf.; Cecilia Kang and Sheera Frenkel, AN UGLY TRUTH: INSIDE FACEBOOK'S BATTLE FOR DOMINATION (2021); Henry Blodget, *Mark Zuckerberg on Innovation*, BUSINESS INSIDER (Oct. 1, 2009) (quoting Zuckerberg: "Move fast and break things. Unless you are breaking stuff, you are not moving fast enough.").

Pew Research estimate puts the percentage of U.S. teens (age 13 to 17) regularly using Meta's Instagram product at 62%[3] – which estimate is most likely understated. More concerning is what this figure does not include – the millions of children under 13 – like A.F. – to whom Meta also is providing its social media products on a daily basis.

7.      Millions of U.S. children and teens access Instagram hundreds, if not thousands, of times each day, and spend hours on social media to the point of extreme exhaustion and sleep deprivation. Millions of minor users also want to quit using Instagram but feel as though they cannot.[4]   And some of Meta's minor users are so locked-in to its products that they harm themselves and/or put themselves in harms' way when their parents attempt to limit or remove access to Instagram.

8.      Meta is aware of these harms, and their pervasiveness, yet disregards them because it is counting on its designed addictions and exploitation of children and teens to keep Meta in its position of unchecked growth and power.

9.      Peer reviewed studies and the available medical science have identified social media use as a cause of major mental health injuries among youth. Large observational studies and experimental results point to such use as the cause of sleep deprivation, anxiety, depression, anger, eating disorders, suicidal ideation, and suicide and self-harm. More to the point, Meta's own internal studies and/or observations have concluded the same.

10.     Meta's own studies, reports, and recommendations have likewise identified several specific product features that are inherently dangerous or harmful to Meta's minor users. This includes but is not limited to features like Meta's public profile setting, direct message settings, and user recommendation algorithm, as well as the "like" feature, filter options, and the sheer volume of harmful content pushed by Meta's technologies (more specifically, by Meta's programming decisions as they relate to those technologies). Meta routinely and knowingly makes these and a myriad of other products available to minors, like A.F., despite actual knowledge that

---

[3] *See https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/*
[4] *See* https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/ (35% of teen users say it would be somewhat hard to stop using social media, while 18% say it would be very hard. Meta's own documents establish known dependency on Instagram by teen users, and behaviors characteristic of addiction, including but not limited to the stated desire but inability to quit using.

COMPLAINT                                                          4

these features contribute to and cause a significant percentage of the abuse and exploitation harms to children occurring on Meta's platforms. Meta not only makes its products available to such children, but it also actively markets and designs its products to reach children under 13 directly and to ensure maximum engagement.

11.     Meta knows that its products are harming kids and its employees have identified product changes that would prevent or reduce these harms – most if not all of which are changes Meta could make in a matter of hours and with nominal expense.

12.     Meta refuses to make those product changes and, instead, has continued to design and distribute its products in a manner it knows to be harmful to its minor users, users like A.F. Meta invests billions of dollars to design and develop its products to encourage, enable, and push content to children and teens that Meta knows to be problematic and highly detrimental to their mental health. Meta likewise invests billions of dollars to design and develop products that encourage and enable its adult users to connect with children and teenagers, despite its knowledge that such products are harmful (even fatal) to some percentage of its child and teen users. Meta leadership decided that this is a price worth paying for increased communication and continued development of its technologies – but it is not and, regardless, it is not a choice Meta (or any company) had the right to make.

13.     Meta and certain of its leadership have perpetrated a terrible fraud and cover-up upon the American public, and the world, and have gotten away with it for far too long.

14.     Plaintiffs bring claims of strict liability based upon Meta's defective design of its social media products that renders such products not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to minors arising from their foreseeable use of Meta's products with a negligible increase in production cost.

15.     Plaintiffs also bring claims for strict liability based on Meta's failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their social media products. The addictive quality of Meta's products and the impacts of its harmful recommendation technologies

are unknown to minor users and their parents.

16.     Plaintiffs also bring claims for common law negligence arising from Meta's unreasonably dangerous social media products and its failure to warn of such dangers. Meta knew, or in the exercise of ordinary care should have known, that its social media products were harmful to a significant percentage of its minor users and failed to redesign its products to ameliorate these harms or warn minor users and parents of dangers arising out of the foreseeable use of its product. Meta's own former and/or current developers often do not allow their own children and teenagers to use these social media products.[5]  Meta has had actual knowledge that its social media products are dangerous and harmful to children for years yet went to great lengths to conceal such facts from the public and government regulators and failed to warn parents about known harms for its own economic gain.

17.     Plaintiffs bring claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, *et seq*. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

18.     Plaintiffs also bring a claim for unjust enrichment. Meta received a direct benefit from the problematic, harmful, and unauthorized use of its product as described herein.  It would be unjust and inequitable for Meta to retain those ill-gotten benefits.

19.     Plaintiffs bring a claim for invasion of privacy. Defendant's conduct detailed herein frustrated and intruded upon Plaintiffs M.F. and B.F.'s fundamental right to protect their child and to monitor and control their child's use of social media, and this intrusion occurred in a manner that was highly offensive to a reasonable person.

20.     Plaintiffs' claims do not arise from third party content, but from Meta's product design, manufacturing, marketing, programming, and distribution decisions, its refusal to make its products safer despite actual knowledge of resulting harms, and its many failures to warn. Plaintiffs likewise do not allege that Meta has some general duty to supervise or monitor content. This lawsuit is about unilateral changes Meta could and should have made to its social media

---

[5] *See*, *e.g.*, https://www.foxnews.com/tech/former-facebook-exec-wont-let-own-kids-use-social-media-says-its-destroying-how-society-works

products to protect its minor users from the harms described herein, and its decision to not protect these minor users based on Meta's determination that a dangerous product would make it more competitive and more money.

## II.    PARTIES

21.    Plaintiffs M.F. and B.F. are the custodial parents of 11-year-old A.F. Plaintiffs M.F. and B.F. have not entered into a User Agreement or other contractual relationship with Meta in connection with A.F.'s use of any Meta product. As such, Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver provisions contained in said agreements or terms. Plaintiffs M.F. and B.F. also expressly disaffirm for and on A.F.'s behalf all User Agreements with Meta that their minor child may have acknowledged.

22.    Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, an application that is widely available to users throughout the United States.

23.    At all times relevant hereto, Defendant Meta Platforms, Inc. was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Meta Platforms, Inc.

## III.    JURISDICTION AND VENUE

24.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states. Venue is proper in this District under 28 U.S.C. § 1391(b)(2)

25.    This Court has personal jurisdiction over Defendant Meta because it is headquartered and has its principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Meta's principal places of business is in the Northern District of California.

## IV.    DIVISIONAL ASSIGNMENT

26.    The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims

occurred in San Mateo County, where Defendant Meta maintains its primary place of business.

## V.   FACTUAL ALLEGATIONS

27.     In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use Meta's social media products – Facebook and Instagram – in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). The Facebook Papers originate from Meta and prove known dangerous designs and design defects as well as other dangers caused by Meta's products and safety-related decisions.

28.     Meta has actual knowledge about the harms its products cause users, particularly teen, child, and other vulnerable user populations, and Meta continues to operate those products in a harmful and dangerous manner anyway and in the interest of maintaining its competitive position and increasing already astronomical profits. Even with the previously disclosed documents – which number in the thousands –Plaintiff anticipates literal truckloads of additional evidence that will support these claims and show precisely what Meta has done and continues to do in the name of corporate greed and power.

29.      Meta is making calculated cost-benefit business decisions and has consistently prioritized its already astronomical profits over human life.

## A.   Facebook and Instagram Background

30.     Facebook, founded in 2004, is the world's largest social media company, and its motto until recently was "Move Fast and Break Things," while Instagram began as a simple photo-sharing application, purchased by Facebook (now "Meta") in 2012.

31.     When Meta began, access to its products were limited to college students, with email and/or domain verification to confirm the same.  In September 2006, Meta opened Facebook up to everyone. It claimed that it would provide access only to persons 13 and older, and that users under 18 should obtain parental consent, but also stopped verifying age or identity.  At all times relevant, Meta did not even verify existence of a valid email address. These product changes were

good for Meta's bottom line but resulted in the complete absence of any safety features for children and teens, and harm to those same minor users.

32.     In 2009, Meta launched the "like" button product and, in 2011, it launched Facebook Messenger. By 2012, when Meta acquired the Instagram product, it was making rapid and significant changes to all its products, as well as changes in data collection and advertising policies and procedures, focused on increasing engagement at any cost. And Meta succeeded. Its product designs and related programming decisions bolstered engagement and revenue, particularly among children and teens, but did so in ways Meta knew to be harmful to these same children and teens. For example, Meta designed and distributed addictive and harmful social comparison product features and implemented workflows and recommendation technology speeds to make it harder for minor users to put its product down, even for a matter of minutes. Meta also re-designed and programmed its push notifications to have maximally addicting impact, and it designed specific products to appeal to and lock-in minor users based on vulnerability factors like development stages of minor users' frontal cortex. Meta spent billions on these efforts and knew what it was doing.

33.     Meta is still spending billions on these efforts and continues to look for ways to escalate its unbreakable hold on (a/k/a addiction) minor users. To name only one example, in 2014, Meta applied for just one of its many patents for new processes and systems in connection with its recommendation technologies. Patent No. 9,798,382, Systems and methods of data and eye tracking analysis, relates to the eye tracking processes Meta intends to use or uses in connection with its content recommendation systems (a/k/a algorithms). Meta has denied current use of this patented technology. It is unknown whether Meta's representations on this point were accurate, but regardless, it is worth noting that this technology would permit, among other things, tracking of eye movements, pauses, etc. This means, for example, that if someone pauses on offensive content because it is *offensive* but has no desire to view or otherwise engage with the content, as evidenced by the fact that they do not like, react to, or share the offensive content, Meta could use the fact of the pause to identify and push similar content to them anyway. Meta has no concern for consent, only engagement, and it is unclear whether Meta is using or will use this tech and in what

manner.

34.     Meta has several patents relating to its social media products. For example, it patented its Newsfeed product, *see* U.S. Patent No. 8,171,128, "Communicating a newsfeed of media content on a member's interactions in a social network environment" (filed August 11, 2006, granted May 1, 2012). The patent "describes keeping a profile of each person on the social network in a database, identifying relationships between said users, generating 'stories' based on the connections, and then creating a News Feed for each user."[6] Millions of users, including A.F., have been harmed by these patented technologies, utilized by Meta in its Facebook and Instagram social media products.

35.     In 2015 and 2016, Meta made other changes to its Facebook and Instagram content recommendation technologies, including programming its products for engagement rather than user interest or safety. And it implemented a multitude of other technologies meant to help Meta determine what might catch each user's attention, irrespective of what the user requested or wanted to see, including utilization of user data in connection with activities undertaken *off* the Facebook and Instagram social media products. By focusing on engagement and altering its products to maximize and influence such engagement, Meta removed any modicum of user control, and without disclosure and behind closed doors.

36.     With the knowledge that teen and child users were Meta's only opportunity for growth in the United States, Meta ramped up its marketing to children and teens – including and specifically to children under 13. It designed several new products and re-designed several existing products on its Facebook and Instagram platforms, launched and marketed games and emojis, and became significantly more involved with content creation.  It also spent millions discussing and finding ways to bypass older siblings, so that it could engage and addict these underage (potential) users directly and with maximum effect.

---

[6] *See* https://www.zdnet.com/article/facebook-patents-the-news-feed/; *see also, e.g.* https://info.ipvisioninc.com/blog/4-creepy-facebook-patents-that-are-actually-real (discusses various, invasive social media products for which Meta has obtained patents, which Meta may or may not be using on its users – which information is known only to Meta); https://www.forbes.com/sites/nicolemartin1/2018/11/20/facebook-files-algorithm-patent-to-predict-who-you-live-with/?sh=3b987fe73544 (discussing Facebook patent application to use algorithms to determine who lives in the same household);

37.     Meta also continued finding new ways to monetize user content and the users themselves, including development of incredibly complex and invasive advertising products, tools, and technologies – which have made Meta billions in revenue on an annual basis, at the expense of Meta's users, including minor A.F.

38.     Throughout these product changes, re-designs, and launches, Facebook founder and CEO, Mark Zuckerberg, made public statements assuring the world that safety was Meta's top priority. For example, in February of 2017, he published a manifesto on his personal Facebook page titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest extent to keep users safe, and how amazing its products are for bringing communities together and promoting critically important social groups. We now know these statements to be untrue, and profoundly dangerous, given what was actually happening at Meta and what Mr. Zuckerberg knew about the harms his products were causing American youth.

39.     By 2017, Meta employees were already reporting to Meta leadership – including and specifically to Mr. Zuckerberg – that Meta products were causing harmful dependencies. Meta was studying and purposefully designing its products in a manner that required sunk cost and system effects that would ensure its ability to lock-in its youngest users – that is, making sure that they would never leave. Meta was marketing to children under 18, as well as children under 13 despite clear legal mandates that it could not knowingly allow children under 13 on its social media products. And Meta leadership was actively rejecting proposed re-designs and fixes that would have minimized harms Meta's products were causing to children and teen users, like minor A.F. Meta rejected those recommendations because engagement was its first priority and teens and children were its primary target for acquisition – that is, Meta determined that it could not make both a safe product and an astronomically profitable and competitively dominant product.  Meta had long since identified teens and children as the key to these objectives, so pursued its goal single-mindedly and with actual knowledge as to the devastating harms it was causing to its youngest users and their families.

40.     Meta also creates images and GIFs for users to post on their videos and pictures in

connection with its Facebook and Instagram products. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Facebook and/or Instagram. The GIFs, images, and music are integral to the user's post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. A Facebook and/or Instagram user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement, advertising revenue, and other profits for Meta itself.

41.   Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all. To name only one example, in 2012, Meta revised its Instagram Terms of Service to the following,[7]

To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

42.   Meta's current terms are different, but still grant it the right to use all third-party content at its sole and unilateral discretion. In other words, Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

43.   Meta knows that it is harming teens yet, when faced with recommendations that would reduce such harms exponentially, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users.

[7] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

44.     Meta knows that underage users are on its platform and has deliberately designed its product in a manner intended to evade parental authority and consent, including but not limited to Meta's failure to verify age and identity, provision of multiple accounts, marketing aimed at informing minors that they can open multiple accounts, failure to provide a point of contact for parents to notify Meta of lack of consent, marketing aimed at children and that encourages children to use Meta's social media product without consent, and multiple other features and conduct by Meta which ensures that young users have a means to access Meta's social media products no matter the circumstances.

45.     With the exception of circumstances where Meta has tried to publicly save face, its leadership has quite literally sat back and done nothing in the face of actual knowledge of unauthorized and underage use of its products. Such use is seen by Meta leadership as a unique value proposition. It makes Meta more money and Meta leadership is operating under the belief that there is nothing parents can do about it.

46.     The Facebook and Instagram products are used by many millions of children every day, children who have become addicted to these products because of their design and product features, children like A.F.  Meta has locked-in these children to the point where parents continually try to remove all access to these products without success and/or where they cannot remove access with risking self-harm, suicide, and other foreseeable consequences of serious addiction.

**B.     Meta Designed and Distributed Inherently Dangerous and/or Defective Products to Minors and Failed to Warn**

47.     Instagram contains countless features that serve no critical purpose relating to product functionality or a user's ability to access other users' content.  While this complaint addresses known features, on information and belief, there are countless other features and technologies designed, developed, manufactured, operated, and distributed by Meta that currently are unknown to Plaintiffs for the simple reason that Meta has concealed the truth and operates with zero transparency. Upon information and belief, it is in the public interest for this Court to permit discovery of all such product features and processes. The following describe just some such

1    features and defective designs.[8]

2                **News Feed, Explore, and other Content Recommendation Products**

3          48.    Both the Facebook and Instagram products show users a "feed." A user's "feed" is

4    comprised of a series of photos and videos posted by accounts that the user follows, along with

5    advertising and content specifically selected and promoted by Instagram.

6          49.    Meta exerts complete control over a user's Instagram "feed," including through

7    certain ranking mechanisms, escalation loops, and/or promotion of advertising and content

8    specifically selected and promoted by Meta based on, among other things, its ongoing planning,

9    assessment, and prioritization of the types of information most likely to increase engagement. In

10   other words, Meta is programming its own targeted advertisements and algorithms in a manner

11   that is causing harm to millions of its users, including A.F.

12         50.    In the case of certain vulnerable user groups, including females under the age of

13   18, Meta's programming decisions and actions translate to its deliberate and repeated promotion

14   of harmful and unhealthy content, which Meta has studied and has found to be causing harm to its

15   youngest users – including harms to young female users at rates disproportionate to similarly

16   situated young male users.

17         51.    Over time, Meta made the cost-benefit decision to slowly switch its News Feed in

18   ways that Meta later determined and confirmed as harmful to its users. For example, Meta switched

19   from maximizing time-spent to maximizing sessions, even though it has since determined that

20   maximizing sessions can lead to and cause unhealthy dependencies – particularly among users

21   under 18. Meta also made the cost-benefit decision to not program for user safety, even in the case

22   of minor users, and only adjusts that programming lever when needed to protect Meta itself.

23         52.    Meta's programming decisions and product designs, *i.e.* recommendation-based

24   feeds and product features, promote harmful content ranging from massive amounts of negative

25   social comparison content to shocking and outrageous content such as hate speech, pornography,

26   child and animal abuse, and even live suicides and/or the glorification of suicide and self-harm

27   _____

28   [8]  These are just known examples, and Plaintiff believes that he will identify other examples of harmful product
     features through discovery in this case.

among children and teens. Again, Meta is aware of the impact its programming decisions are having on its youngest users. It simply does not care enough to prioritize user safety over its own revenue and growth objectives.

53.     In 2021, Senators Richard Blumenthal, Marsha Blackburn, and Mike Lee tested and confirmed the fact that Meta's recommendation-based technologies and product features promote harmful (even discriminatory) content by having several accounts opened while providing information indicating that the users were teenage girls,

> "Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."
>
> Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."
>
> The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.
>
> In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.
>
> According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.
>
> Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.
>
> "We will correct that," he said.

*See*     https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli.

54.     Meta has had knowledge of these issues for almost a decade, at the very least, and has had every opportunity to fix them but has not – instead, Meta continued to design and operate its products in a manner meant to maximize user engagement, including at the known expense of

user safety. Indeed, Meta itself has run the type of tests described by Senator Blumenthal, and Meta's tests have reached the same conclusions: that Meta's products (not third parties posting on Meta's products) are affirmatively identifying and directing children to harmful content, in a harmful and discriminatory way. Meta employees have tried to sound the alarm on these harms, only to be shut down by Meta leadership.

55.    Meta directly benefits from the harms it is causing, both via increase engagement of third parties and minor users, but also, because Meta is directing harmful advertising content at these same minor users and is then paid by advertisers based on each user to whom it can push such content. On information and belief, Meta develops technologies to maximize its advertising-based revenues, including a product that can estimate with reasonable certainty a user's actual age irrespective of what the user claims when opening their account. Meta utilizes this technology, including to maximize its revenue. For example (and hypothetical) only, if Meta could not determine the actual age of each user, then it would have to report having shown an advertisement to only 8 million female users who self-identify as under 16, rather than 11 million female users who actually are under 16. By developing a product that is able to estimate or determine actual age with reasonable certainty, Meta is able to maximize its advertising revenues. The irony is that Meta then testified before the U.S. Congress that it has no way of knowing when a user is under 13 as it relies on the ages provided on opening of an account – only Meta does have knowledge and has utilized that knowledge to its own benefit on more than one occasion. Meta cannot run internal reports showing "estimated" actual user ages on the one hand, then claim that it has no knowledge regarding actual user ages on the other hand.

56.    Instagram also has a search feature, called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Again, Meta designed and operates its product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue increase.

57.   Meta also has conducted studies to identify precisely which of its algorithmically promoted content is most harmful to users, and the degree of harm that content causes. *See, e.g.,* "Social Comparison: Topics, celebrities, Like counts, selfies" and "Appearance-based Social Comparison on Instagram." Despite being able to identify the harmful categories, as well as volume and amplification product defects causing harm, Meta ultimately determined that its promotion of such content is a large part of what makes the Instagram product appealing to teens and decided against changing its current product, irrespective of identified harms.

58.   Instagram has also added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories." These products were developed to appeal specifically to minor users, and Meta knows that they contribute to problematic use and other harms suffered by minor users from use of the Instagram product. To name only example, Meta failed to implement standard product features in its Stories product, which reduced the safety of that product to the detriment of a significant percentage of its users – including and primarily minors and persons of color.

59.   Meta is exerting a degree of manipulation and control over its users via its unchecked technologies that far exceeds anything the world could have contemplated even a decade ago. Meta regularly "experiments" on users—users with no idea that they are being monitored and examined—to test product ideas, but also, to identify mechanisms through which Meta can control user behavior for its own profit. Meta is not targeting millions, thousands, or even hundreds of users in this manner. Instead, its technologies allow it to target every single user simultaneously and on an individual basis, which fact makes its algorithmic and social media products far more dangerous than other products. Additionally, Meta's programming decisions are aimed to encourage and cause dependencies and harmful levels of use of its products.

60.   There are tens of thousands if not millions of additional Meta documents and data sources that the world will need to see to fully appreciate and understand how Meta's products function and what Meta (and its primary competitors in the social media industry) have knowingly done to our children and teens.

61.   Meta could make its products exponentially safer for minors through any number

of quick and inexpensive changes. To name only a few examples,

    a.   Meta currently programs its recommendation technologies to prioritize engagement but could program those technologies instead (either generally or specific to accounts used by minors) to prioritize safety.

    b.   Meta chooses the speed at which it runs its algorithms and knows that its chosen speed has significant impact on problematic use and resulting sleep deprivation. Meta has analyzed but refused to make small changes to its product speed which, if made at a set time each evening in the case of every account used by minors, would exponentially reduce the difficulties minor users have stopping their use at night and to sleep.

    c.   Meta could slow, restrict, or even stop entirely its use of recommendation technologies in connection with minor accounts, any one of which would significantly reduce harms to minor users at nominal cost to Meta.

    d.   Meta could collect less or different data from minor users and/or utilize less or different data in connection with minor users, which unilateral changes would significantly reduce harms to minor users at nominal cost to Meta.

    e.   Meta could stop approving harmful advertisements and/or restrict or limit the types and frequency of advertisements it directs to minor users, which unilateral changes would significantly reduce harms to minor users at nominal cost to Meta.

All of these examples are changes Meta could make in a matter of hours, not days, and it could make these changes across the totality of minor accounts. It would cost Meta almost nothing to make these changes.

### Profile Settings

62.    Meta's public profile settings are inherently dangerous and defective when utilized in connection with minor users.

63.    User profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. On public profiles, however, any user can

view the photos, videos, and other content posted by the user. Worded otherwise, strangers can view and message underage users as they please and without supervision or parental consent.

64.     During the relevant period, Instagram profiles were public by default and Instagram allowed all users to view, message, friend, send follow requests, etc. to underage users, including and specifically A.F.  The public profile default and setting serve no critical purpose in terms of product functionality or users' ability to access content. Rather, Meta determined that public profiles were good for engagement.

65.     In fact, Meta documents acknowledge that Meta's public profile feature is one of several that results in harms to minor users. While other Meta documents conclude that Meta's public profile feature is good for increasing engagement, particularly during onboarding (when a user first starts using Instagram) as it encourages and facilitates more connections between users who otherwise would not connect. Unfortunately for Meta's youngest users, a significant number of the would-be connections are harmful and/or direct adult predators to children, which facts also are known to Meta.

66.     At all times relevant, Meta had the ability to default minor accounts (and all accounts where Meta knows or should know that the user is a minor) to private and also the ability to set those accounts to private (not just by default) until the user reaches the age of majority in their state of residence. Meta also had actual knowledge of the harms its profile settings were causing, discussed those harms internally, and opted to do nothing in the interest of engagement and revenue – but at the direct expense of A.F. and her family.

**Direct Messaging Product Feature and Access to Vulnerable Users**

67.     Meta's direct messaging technologies are inherently dangerous and defective when utilized in connection with minor users, and its Direct Message settings permit and encourage harm to vulnerable users.

68.     Harmful and dangerous interactions occur because of the Instagram and Facebook direct message products and current user settings. Meta's preferred settings provide predators and other bad actors with direct and unsupervised access to children and teens. Meta knows this because, again, it has studied and confirmed that its direct message products are causing harms to

a significant number of its minor users.  For example, Meta found that its direct messaging product is where most unwanted interactions (referred to by Meta as "UI") occur, including things like bullying and sexual exploitation of minors. It also determined that by turning off or limiting access to its direct messaging product in the case of minor users, it could significantly decrease those harms. However, it then determined that turning off or limiting access to its direct messaging product in the case of minor users could have a negative impact on engagement and revenue – for example, if some adult users are not able to find and obtain access to minors through the Instagram and Facebook products, they might use a different social media product instead. Likewise, if minor users are not able to make "friends" with complete strangers through the Instagram and Facebook products, *they* might use a different social media product instead.  Meta opted for engagement over user safety, once again.

69.    Meta's direct-messaging products provide other users—including anonymous and semi-anonymous adult users, bullies, and any other stranger for whom a parent would not allow access—with unrestricted and unsupervised access to minor users. Minor users lack the cognitive ability and life experience to identify online grooming behavior by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material and mass-messaging capabilities. Meta allows direct messaging with and by minors without parental notification.

70.    Meta had actual knowledge that restricting its settings in the case of minor accounts would protect minors from unwanted interactions but opted to not restrict those settings in favor of allowing children to engage with strangers – which engagement Meta sees as positive to its bottom line. Had Meta made the product change it considered when it considered it, the dozens of adult male users who exploited and abused A.F. would have been unable to do so for the simple reason that they would have had no way to secretively reach out to her and then engage in the extensive exploitation, abuse, and commercial sex acts that they used Meta's direct messaging products to accomplish.

**User Recommendation Product**

71.    Meta employs recommendation technologies that affirmatively send recommendations to users regarding people or groups they should "friend," join, or otherwise

connect. In the case of user recommendations, Meta calls this product "People You May Know" (for Facebook) and "Suggested for You" (for Instagram). Whatever the name, these technologies and specific Meta products function by taking user data and other information obtained through Defendants' data collection technologies (including information such as age, gender, on-platform and off-platform activities, usage history, habits, interactions with others, and countless other data points) and then using that information to identify and affirmatively direct users to one another via recommendations that the users connect, follow, friend, add, or otherwise.

72.     Meta's user recommendation products are good for Meta's engagement, including because they help users connect with other users with whom they otherwise would not connect. *See* discussion, *supra*, re: user connections during onboarding.

73.     However, and as Meta knows, its user recommendation technology also facilitates and contributes to much of the adult/minor grooming and exploitation that occurs on its products. These are findings Meta itself has made. To be clear, this means that Meta's People You May Know ("PYMK") and Suggested for You ("SY") products (collectively "PYMK/SY") are affirmatively finding, recommending, and connecting predatory adult users to vulnerable minors, that those predators are then able to use Meta's products (for example, its Direct Messaging product) to exploit and abuse those children, that Meta knows that its product is causing these horrific outcomes, and that Meta made a cost-benefit decision regardless to continue the use of its PYMK/SY products in connection with minor accounts.

74.     Meta knows that the more strangers it can connect (including connecting adults to children) the more money it will make and the more locked-in its users will become.

75.     The same general concepts are true for group recommendation algorithms, in that Meta has actual knowledge that it is programming its product in a manner that recommends and amplifies harmful groups but has not made its product safer for the simple reason that Meta leadership prioritizes engagement and growth above user safety. Meta documents confirm that Meta manipulates its users to push them into joining groups for its own benefit and without regard to whether its users are searching for such connections.  Meta also identifies "hold outs," that is, users who are not likely to join Meta's recommended groups no matter what Meta does to push

them in that direction.

## Push Notifications and Emails

76.     Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its Instagram and Facebook products.

77.     Based on individualized data Meta collects, it selects content and notification frequency for its users and notifies them via text and email. Meta's notifications to individual users are specifically designed to, and do, prompt them to open Meta's social media products and view the content Meta selected, thereby increasing sessions and profits to Meta. Meta drafts and decides on the language of these notifications. More to the point, even the format of Meta's notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing. For example, instead of telling a user what someone on their "friends" list said, Meta will create and push a vague and enticing message to the user to maximize the likelihood that the user will log back onto its product.  Meta creates and sends messages like "There are comments on [your friend]'s post you may have missed." Meta's wording of these notifications is deliberate.

78.     Meta also programs its push notification products to send more notifications to the users most likely to take the bait, that is, to its most dependent users, and Meta makes the business decision to send these notifications in excessive amounts and at disruptive times of the day, even in the case of accounts being used by minors.

## Meta's Ownership and/or Licensing Rights in all User Content

79.     Meta also creates images and GIFs for users to post on their videos and pictures. Meta has acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF, or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs, or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates

illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

80.     Meta also has legal rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following,[9]

> To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

81.     Its more recent terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion,

> • **We do not claim ownership of your content, but you grant us a license to use it.** Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with our privacy and application settings). This license will end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the Data Policy and visit the Instagram Help Center.

82.     Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

**<u>Marketing to Kids, Social Comparison, and Other Addictive Product Features</u>**

83.     Instagram also incorporates several unique product features that serve no functional purpose, but that do make Meta's product more appealing to children and teens (*i.e.*, "likes" and

---

[9] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (*i.e.*, "likes" and filters). Meta knows that these product features disproportionally harm teen girls and young women, yet Meta leadership—singularly focused on its economic bottom line—repeatedly rejected product change recommendations that would have protected A.F (and millions of similarly situated children) against these harms.

84.     One example involves extensive testing Meta performed on its "like" button feature. Meta determined that its "like" product feature is a source of social comparison harm for many of its users. This is not surprising given that several of the Meta employees involved in creating that feature have since left Meta and have spoken publicly about the product's addictive nature and harmfulness.[10] What is surprising, however, is that Meta identified the harmful feature (the "like" button) and ran experiments (called "Project Daisy") to see whether hiding the feature completely (called, "Pure Daisy") would reduce the harms, found that it would in fact reduce the harms and in statistically significant numbers when it came to teen users, then made the business decision to *not* launch Pure Daisy for fear that hiding "likes" would result in lower engagement and anger advertisers. Meta leadership chose profit over the health and well-being of teens.

85.     Likewise, Meta has conducted internal studies that identify the types of harmful content Meta identifies and directs to users – and in greater numbers to young, female users. To be clear, these social comparison harms that result from the content Meta is force feeding its users is not caused by any single piece of third-party content. As Meta itself has acknowledged, the harm arises primarily from the manner and volume at which Meta directs this content to its users.

86.     Instagram also is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards. Examples of this include but are not limited to "likes," "followers," algorithm-controlled feed, and unlimited scrolling features.

87.     Meta's selection and recommendation technologies select content for minor users for the purpose of habituating users to the Instagram product. These technologies create addiction

---

[10] *See, e.g.*, https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

in minor users on a content-neutral basis by adapting to promote whatever content will trigger minor users' engagement and maximize their screen time.

88.     Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opted for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every single day.

89.     Further, while each of the above products is dangerous alone, they are substantially more dangerous when combined. For example, Meta's direct-messaging products are more dangerous when coupled with Meta's failure to verify age, identify, and parental consent and its provision of accounts to minors for which parents have no knowledge (or means to monitor) and do not consent. Likewise, its direct-messaging products are more dangerous when combined with Defendants' public profile and recommendation features. These types of products connect complete strangers. They serve no purpose as to platform functionality or the ability to access content posted by others, but they do increase Meta's engagement (and profits) by serving up photos of minors to complete strangers then providing those same strangers with unsupervised access to those minors.

## C.     Instagram and Its Product Features are Products

90.     Meta's social media products and features are designed to be used by minors and are actively marketed to minors across the United States. Meta markets to minors through its own marketing efforts and design. But also, its works with and actively encourages advertisers to create ads targeted that appeal to teens, and even children under the age of 13.

91.     Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its products more appealing and addictive to these age groups, which are seen by Meta as key to profitability and market dominance.

92.     Meta is aware that large numbers of children under the age of 18 use its Instagram product without parental consent. It designs its products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, its own profits

93.     Meta is aware that large numbers of children under the age of 13 use its Instagram

product despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. It has designed its products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, its own profits.

94.     In fact, Meta has <u>actual knowledge</u> as to the age of each user, irrespective of what age a user states when opening an account. Meta obtains this knowledge through its extensive collection of user and device data, which includes information relating to on and off-platform activities, as well as other types of data Meta is collecting without its user's actual knowledge. Meta also has developed and employs technologies that estimate with reasonable certainty each user's actual age and utilizes those technologies to its own benefit, *i.e.* in connection with marketing and advertising, while ignoring the same data when it comes to ensuring that it does not provide access to its product to minors.

95.     Meta has patented several aspects of its technologies and Instagram product features and refers extensively to its Instagram product and product features as products.

**D.     Meta's Business Model is Based on Maximizing User Screen Time**

96.     Meta advertises its products as "free," because it does not charge its users for downloading or using them. What many users do not know is that, in fact, Meta makes a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to its users. Meta receives revenue from advertisers who pay a premium to target advertisements to specific demographic groups – with minors being Meta's most lucrative demographic. Meta also receives revenue by selling its users' data to third parties.

97.     The amount of revenue Meta receives is based upon the amount of time and level of user engagement on its platforms, which directly correlates with the number of advertisements that can be shown to each user.

98.     Meta uses various product features and designs to prompt users to consume its Instagram social media product in excessive and dangerous ways. Meta knows that its designs have created extreme and problematic usage by a significant percentage of all users. In fact, Meta has studied social media addiction (reframed internally by Meta as problematic use) extensively and for many years. Meta has actual knowledge of the estimated percentage of users who engage

in problematic use of its products, of usage patterns highly indicative of problematic use, and of the fact that its minor users are more susceptible to such problematic use and resulting harms.

99.     Meta knowingly and purposefully designed its Instagram product to encourage such problematic use.   It designed Instagram around a series of features that do not add to the communication utility of the product, but instead seek to exploit minor users' susceptibility to persuasive design.   This is referred to as "engineered addiction," and examples include features like bottomless scrolling, continuous loop feed and push notifications, which incentivize users to stay on the product as long as possible and convinces them to log back on. It also includes product features such as likes, followers, tagging, notifications, and live stories, which features are designed to maximize engagement at the expense of user health and well-being. And Instagram's "pull to refresh" is based on how slot machines operate. Pull to refresh creates an endless feed, designed to manipulate brain chemistry, and prevent natural end points that would otherwise encourage users to move on to other activities. These are just some examples of Meta designs that are unreasonably dangerous to the mental well-being of underage users' developing minds.

100.     According to industry insiders, Meta has employed thousands of psychologists and engineers to help make its products maximally addicting.

101.     Again, the amount of revenue Meta receives is based upon the amount of time and user engagement on its product, which directly correlates with the number of advertisements that can be shown to each user. Thus, Meta opts for user engagement over the truth and user safety.

102.     Meta knows that its Instagram product is addictive, and that millions of teen users want to stop using Instagram but cannot.   Meta has known this for years and continued to stay the course regardless of and despite safety concerns voiced by Meta's own employees.

103.     Meta does not warn users of the addictive design of its product. On the contrary, Meta leadership actively and extensively concealed the dangerous and addictive nature of its products, lulling users, parents, and world governments into a false sense of security. Meta consistently played down Facebook and Instagram's negative effects on teens in public statements and advertising, made false or materially misleading statements concerning product safety, and refused to make its research public or available to academics or lawmakers who asked for it.

104.    For example, in or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process.

105.    Meta similarly told U.S. Senators in November 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attended and even presented at an annual conference held in Silicon Valley called the Habit Summit, the primary purpose of which was to learn how to make products more habit-forming.

106.    Meta has spent billions of dollars marketing its products to minors and has deliberately traded in user harm for the sake of its already astronomical revenue stream.

**E.     Meta Has Designed Complex Algorithms to Addict Teen Users**

107.    Meta has intentionally designed its Instagram product to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to one of the largest technology companies in the world.

108.    Meta's recommendation systems select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Instagram product.  Meta's algorithms do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its systems promote.

109.    In the words of one, high-level departing Meta employee:

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[11]

110.    Meta designed and has progressively modified its Instagram product to promote problematic and excessive use that it knows is indicative of addictive and self-destructive use. One of these features is the use of a complex recommendation system to select and promote content that is provided to each Meta user in an unlimited and never-ending "feed." Meta is aware that its algorithm-controlled feed promotes unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health—however, this type of use allows Meta to display more advertisements and obtain more revenue from each individual user.

111.    Meta also knows that content that generates extreme psychological reactions in minor users is more likely to trigger their engagement than content that is benign.  Despite this knowledge, Meta has made the calculated business decision to program its algorithm-controlled technologies to promote to minor users the content most likely to increase engagement.  This content is selected not just based on individual users' viewing history but also on the viewing history of their linked friends, and hundreds if not thousands of data points Meta has collected about each of its users. In short, once Meta hooks its minor users on a content neutral basis, it then identifies and pushes psychologically stressful content to its minor users deliberately. Meta knows that it is programming its technologies in this manner, and that this content is causing harm to a significant number of its minor users, but Meta leadership has refused to undertake simple steps that would reduce these harms in the context of its minor users. To be clear, Meta has discussed and considered various product changes, has actual knowledge that even small changes in how it programs and operates its products (*i.e.* changing the speed at which it directs content to minor user accounts) would have exponential positive impact for its minor users, and yet, Meta leadership continues to prioritize profits over the health and wellbeing of its youngest users.

112.    Meta leadership values revenue and growth over the safety of the children and teens using its product and is operating under the fiction that it cannot be held accountable for these decisions – no matter how many children have been harmed or have died as a result.

113.    The addictive nature of Meta's Instagram product and the complex and

---

[11] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

psychologically manipulative design of its algorithms is unknown to ordinary consumers.

**F.      Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

114.    The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

115.    The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

116.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

117.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses, emotions, and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

118.    The recommendation technologies in Meta's Instagram product are designed to exploit minor users diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Meta has actual knowledge that because its minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Meta's social media platforms and are therefore much more likely to become addicted to Meta's products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters.

119.    Meta has quite literally studied the age and stage of brain development in minors in connection with product design and marketing efforts and makes calculated business designs designed to exploit those vulnerabilities.

120.    Meta has also designed and progressively modified its Instagram product to promote problematic and excessive use that it knows is indicative of addictive and self-destructive use. Instagram's product features are designed to be and are addictive and harmful in themselves, without regard to any content that may exist on Meta's platforms.

G.    **Meta Misrepresents the Addictive Design and Effects of its Social Media Products**

121.    At all times relevant, Meta has advertised and represented that its Instagram product is appropriate for use by teens and has stated in public comments and statements that its product is not addictive and was not designed to be addictive. Meta knows that those statements are untrue.

122.    Meta did not warn users or their parents of the addictive and mentally harmful effects that the use of its product was known to cause amongst minor users. Meta also did not warn users, or their parents of the harms caused by Meta's chosen profile settings, direct messaging products, programming decisions, and other features Meta utilizes for the sole purpose of increasing its own engagement and revenue. On the contrary, Meta has gone to significant lengths to conceal and/or avoid disclosure of the true nature of its product. The following are only some examples.

123.    Meta's marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the Meta products are safe, improve social connectivity, and improve the mental and physical health of its users. For example,

in February of 2017, Facebook founder and CEO, Mark Zuckerberg, posted a manifesto on his Facebook page titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing its social media products are for bringing communities together and promoting critically important social groups.

124.    In April of 2018, Meta founder and CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated:

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[12]

125.    In November of 2020, Mark Zuckerberg again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[13]

126.    In March of 2021, Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.[14]

127.    On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive[15] and repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[16]

---

[12] https://www.youtube.com/watch?v=AB4mB-K7-xY
[13] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/
[14] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.
[15] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).
[16] *Id.* at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

128.    On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive[17] and he downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[18] He testified that Meta's overarching goal is child safety.[19]

129.    Meta's Terms of Use also represent that Meta is "Fostering a positive, inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure."

130.    The sheer volume and specificity of these statements are indicative and reflective of the lengths to which Meta leadership was willing to go to deceive and/or mislead a substantial percentage of the global population. Meta leadership fed these sorts of deceptive and/or misleading statements to the public for years, to convince people that its products were safe for use by children and teens. When in fact, Meta knew that its products were not safe. Meta knew that its products are addictive and harmful to a significant portion of users, including teen and pre-teen girls.

131.    Meta's public statements and other marketing and advertising materials failed to disclose the truth, in fact, Meta has gone to considerable lengths to conceal the truth. This includes creating a corporate culture that convinced thousands of Meta employees that if they went public with what they knew they would lose their careers, no one would believe them, and/or that Meta would then lock down internal communications in a manner that would make it impossible for the employees left behind to work toward effectuating change from the inside. When in fact, Meta never intended to allow change from the inside. It intended to pursue engagement and growth at the expense of human lives and did everything it could to hide these facts from the world.

---

[17] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.
[18] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.
[19] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

1    132.    Meta lied about the harm its products are causing.

2    133.    Meta's omissions were also misleading and deceptive in every respect, for example,

3    talking about how its social media products make some users' lives better and ignoring the fact

4    that its products are causing serious (even fatal) harms to other users. Meta has an internal term,

5    SSI, which it uses for the harms of Suicide and Self-Injury. Meta was internally discussing the fact

6    that its product worsens and causes Suicide and Self-Injury in some of its youngest users yet failed

7    to disclose and actively concealed this information.

8    134.    In September of 2017, former Meta CEO, Sheryl Sandberg, was asked about a Meta

9    product that enabled advertisers to target users with offensive terms. In response, Meta CEO,

10   Sheryl Sandberg, apologized and vowed that the company would adjust its ad-buying tools to

11   prevent similar problems in the future. She also represented that "We never intended or anticipated

12   this functionality being used this way — and that is on us."[20]

13   135.    What the former Meta CEO deliberately failed to mention was that the identified

14   product defect was among the less harmful of countless defects known to Meta at that time. She

15   failed to tell the public that Meta was aware of the harms its products were causing, including

16   Suicide and Self-Injury harms and product features that were actively contributing to the

17   occurrence of sexual exploitation and abuse of minors on Meta's platforms, but refused to

18   implement safety tools and other cost-effective fixes for fear of decreasing engagement and, in

19   turn, corporate profits.

20   136.    Meta failed to disclose, and spent years actively concealing, the fact that its social

21   media products cause addiction, sleep deprivation, anxiety, depression, anger, self-harm, suicidal

22   ideation, and suicide, among other harms, and that its products encourage, abet, enable, and

23   facilitate the sexual exploitation and abuse of minor users. All of these harms were known to Meta.

24   Meta not only failed to warn users and their parents of these harms but did everything it could to

25   convince the world that they did not exist.

26

27

28
_____
[20] https://www.nytimes.com/2017/09/21/technology/facebook-frankenstein-sandberg-ads.html

**H.     Plaintiff Expressly Disclaims Any Claim That Meta is Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

137.    Plaintiffs seek to hold Meta accountable for its own alleged acts and omissions. Plaintiffs' claims arise from Meta's status as a designer, marketer, and distributor of dangerously defective social media products, as well as Meta's own statements and actions, and not as the speaker or publisher of third-party content.

138.    Meta affirmatively promotes, encourages, and/or otherwise contributes to the development of harmful content, as revealed in an October 2021 Senate Hearing involve Meta's own documents. Those documents revealed that,

    a.  Meta approves of ads that contain harmful content, for example, "designed to encourage and promote anorexia" and encourage children to abuse prescription or illegal drugs, which ads Meta then targets specifically at children in exchange for payment.

    b.  Meta utilizes private information of its minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Meta specifically selects and pushes this harmful content, for which it is paid, to increase user engagement. "That's how Meta can push teens into darker and darker places." (Senator Blumenthal, October 5, 2022).

    c.  Meta knows that its "amplification algorithms, things like engagement-based ranking … can lead children from very innocuous topics like healthy recipes … all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time." Meta has knowledge that it is programming and distributing its products in a manner that is harmful to young users and chooses "profits over safety."

139.    Meta designed and has progressively modified its Instagram product to promote problematic and excessive use that it knows to be indicative of addictive and self-destructive use. The Instagram product is designed to be and is addictive and harmful in itself, without regard to

any content that may exist on Instagram.

140.    Meta's public profile and direct messaging products are, standing alone, harmful to minor users irrespective of content third parties may be posting on Meta's platform. Meta has studied and is aware of these harms and opted against suggested and known product changes in favor of engagement and growth.

141.    Meta's user recommendation product is, standing alone, harmful to minor users (and helpful to predatory, adult users) irrespective of content third parties may be posting on Meta's platform. Meta has studied and is aware of these incredible harms – which include solicitation, grooming, and abuse of children – and opted against suggested and available product changes in favor of engagement and growth.

142.    Meta's content recommendation technologies and the engagement-based programming decisions Meta makes in its operation of those technologies (including but not limited to the speed at which Meta operates the technologies, times of days during which it operates them, data it uses to operate them, and similar features controlled and operated entirely by Meta with no transparency outside of Meta) are, standing alone, harmful to minor users irrespective of content third parties may be posting on Meta's platform.

143.    Meta has studied and is aware of these incredible harms – which include but are not limited to dependance on Meta's social media products and Meta's identification, amplification, and direction of harmful content to minors who are dependent on Meta's social media products – and opted against suggested and known product changes in favor of engagement and growth.

144.    Meta's "like" button and programming decisions (which result, among other things, in the directing of exponentially high amounts of harmful social comparison content to young, female users) are, standing alone, harmful to minor users irrespective of content third parties may be posting. Meta has studied and is aware of these harms and opted against suggested and known product changes in favor of engagement and growth.

145.    Meta also has actual knowledge that it is has designed its Instagram product in a manner that interferes with parental rights and results in Meta's unauthorized distribution of its products to minors absent parental knowledge and consent. Meta not only has actual knowledge –

it has studied and implemented product changes intended to encourage such unauthorized use by minors. This includes but is not limited to ignoring actual knowledge data Meta has about underage users (*i.e.* users under 13), including A.F. It also includes product changes Meta made for the purpose of making it easier to open and access multiple accounts, as well as marketing Meta pursued for purposes such as letting minors know that they can open multiple accounts, utilizing its teen users to recruit those users' underage siblings and then finding ways to reach those same underage children outside of and around their older siblings' influence so that Meta could encourage greater use of its products than what those children's older siblings were modelling.

146.   Meta has no limit when it comes to targeting and exploiting children – except, of course, when it comes to the children of its principals and designers, who are often restricted or prohibited by their parents from using Meta's harmful social media products.

147.   None of Plaintiffs' Claims for Relief set forth herein treat Meta as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Meta liable for its own speech and its own silence in failing to warn of foreseeable dangers arising from anticipate use of its products. Meta could manifestly fulfill its legal duty to design a reasonably safe social product and furnish adequate warnings of foreseeable dangers arising out of the use of its Instagram product without altering, deleting, or modifying the content of a single third- party post or communication. Some examples include,

148.   Not using its addictive and inherently dangerous recommendation technologies in connection with any account held by a user under 18.

149.   Not permitting any targeted advertisements to any user under 18.

150.   Prioritizing internally its existing programming when it comes to content pushed to users as well as enforcement of its own terms of service and communicate standards, and so that it errs on the side of limiting the amplification of harmful content and enforcement of its own terms and standards, rather than its current programming and product decisions which are focused on engagement and growth.

151.   Requiring identification upon opening of a new account, requiring parental consent for users under the age of 18, and restricting users under the age of 18 to a single account.

152.    Requiring verification of email and phone number when a user opens a new account. Not requiring verification allows underage users to access these social media products and does not stop bad actors.

153.    Immediate suspension of accounts where Meta have reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments or chats and/or messages with any third party and where Meta can determine an "estimated" age of under 13 based on other information it already collects and/or has in its possession; and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

154.    Suspension of accounts and, in some cases, user bans, where Meta has reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other users; and not allowing the account to resume until the user provides proof of age and identity.

155.    Removing social comparison product features and/or re-designing or hiding those features in ways Meta's own studies have confirmed as reducing harmful impact on teen users.

156.    Instituting advertising safeguards to ensure that Meta is not profiting directly from or otherwise pushing or endorsing harmful advertising content and removing advertising targeting tools so that advertisers cannot harm vulnerable user groups by aiming harmful advertisements at them.

157.    Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

158.    Programming all recommendation systems used in connection with minor accounts to prioritize safety instead of engagement, and/or restricting or disabling user and group recommendation systems in connection with minor accounts (so, not recommending to teen users, but also, not recommending teen users to adults).

159.    Restricting and/or disabling direct messaging in connection with users under the age of 18.

160.    Restricting and/or disabling inherently dangerous product features within the direct

messaging product and for uses under the age of 18, including features like disappearing and live photo and video capabilities.

161. Not collecting data or certain date types from minor users and not using certain data types when programming recommendation technologies Meta utilizes in connection with minor accounts.

162. Any number of quick programming changes that Meta knows would have a significant impact on the health and well-being of minor users, for example only, reducing programming speed in the evenings or restricting access by minors altogether from 11 pm until 6 am.

163. Not creating and sending push notifications or other communications designed to encourage excessive use of Meta's product to any user under 18, and/or imposing limits on the number Meta creates and sends to such users.

164. Limiting the number of times Meta's Instagram product can be installed on a given device in a specified amount of time (which would prevent minors from uninstalling and re-installing the Instagram product on their cell phone to conceal use from their parents).

Again, these are just some examples. On information and belief, Meta leadership has already received hundreds if not thousands of recommendations from its own employees as to how it can make its products safer for its users. Meta leadership has opted to shelve those recommendations, and dusts them off only when and if the general public reports on a particular harm – at which time, Meta claims that it could not have foreseen the harm in an effort to save itself from the consequences of bad press. Meta was not only able to foresee every harm alleged in this Complaint, but foresaw it, had an opportunity to prevent it, and opted to maximize engagement and growth instead – to the detriment of A.F. and her family.

165. If Meta attempts to deny these allegations, this Court should require Meta to disclose every product recommendation it has received from its employees over the years and relating to harms and issues like "problematic use," "SSI" (Suicide and Self Injury), harmful social comparison, users under the age of 13, bullying, and exploitation/grooming/abuse of minors. Plaintiffs believe that those recommendations will

prove both that Meta anticipated the harms its products have caused and will provide answers to the question of what Meta could and should have done differently.

## VI.    PLAINTIFF-SPECIFIC ALLEGATIONS

166.    A.F. was born in February of 2011.

167.    She was a typical, sweet kid. She often struggled in school, but always tried hard and was able to keep up her grades. She loved playing sports with her friends and hanging out with her parents and siblings.

168.    A.F.'s parents separated in April of 2020, and their divorce was finalized seven months later.

169.    They purchased A.F. a phone so she could contact each parent while staying with the other. M.F. does not use social media, and when A.F. asked her parents if she could open social media accounts, both of them said no.

170.    Her parents believed that this was the end of the issue as she was only 9 at the time. They did not consent, and reasonably believed that no one could or would provide a nine-year-old child with a social media account absent parental consent.

171.    Unbeknownst to A.F.'s parents, however, she proceeded to open and use multiple Instagram accounts as well as the Facebook Messenger product. It is unknown at this time whether or to what extent A.F. opened other social media accounts, as she worked hard to hide these activities from her parents. A.F. was still only 9 years old, and her secret use of and developing addiction to Instagram and the Facebook Messenger products coincided with a steady and severe decline in A.F.'s mental and physical health.

172.    As an initial matter, A.F. used the circumstances created by her parents' divorce to hide her use of Instagram and Facebook Messenger.

173.    For example, A.F. would tell her father that she forgot her cell phone at her mother's house, when in fact, she was hiding her phone in her bag and would wake up after her father had gone to sleep so that she could use Instagram and Facebook Messenger without him knowing. She used these same tactics on her mother. And when her parents tried to check her phone, she often said she could not find it, did not have it, or, on occasion, would produce a damaged device that

was inaccessible.

174.    As A.F.'s dependency on Meta's products grew, she became incredibly attached to and guarded about her cell phone. When her parents tried to exercise their parental rights by limiting or restricting access, A.F. had severe and uncharacteristic reactions. She became agitated, upset, and emotional when access was limited which, and would yell and become violent towards others. Unbeknownst to her parents, these reactions were caused by her dependency on Meta's social media products.

175.    A.F. became locked-in to the point where she used Meta's products every chance she could. Because her parents did not know about or approve, this meant she stayed up after they went to sleep in order to use Meta's products, which she did for hours upon hours.  A.F. became increasingly tired in school, and her grades dropped from As and Bs to Fs. She also began accessing Meta's products during school hours, as that was another time when she could do so without risking getting caught.

176.    For every minute A.F. spent on Meta's products in the middle of the night and during school hours, Meta earned more money. Meta has actual knowledge as to the times of day each user is on Instagram and how long they are on Instagram. Meta likewise has determined that excessive use, frequent but short sessions, and use during sleeping hours is a significant indicator of addiction (which Meta re-frames as "problematic use"). Despite this knowledge, Meta leadership made calculated and deliberate decisions to stay the course, *i.e.* to not notify parents or take other reasonable steps to discourage such harmful use of its products. Several Meta employees have expressed concern about the addiction-related harms Meta is causing because of how its programs, designs, and develops its products, and including addiction related harms Meta is causing to minors. In response, Meta leadership has made clear that engagement and growth take precedence over user safety. Anyone who disagrees with Meta leadership is free to move on.

177.    Meta also had knowledge as it relates to A.F. that A.F. was under the age of 18, irrespective of anything A.F. stated when opening her many Instagram accounts. Meta has knowledge as to the actual age of most if not all users because of technology Meta has developed, which algorithm uses the many points of data Meta collects to estimate actual age with reasonably

certainty. Moreover, Meta knows that millions of minors are not being truthful about their age when opening Instagram accounts.

178.    To name only one example, Meta has analyzed and internally discussed the fact that there are certain spikes in user-stated ages that establish the fact that many users are providing false information. For example, when Meta looks at the stated age of all users, there is a clear pattern for most users with consistent spikes for ages most commonly used for provision of false information, such as 13, 16, 18, and 21. Put otherwise, if Meta audited each age where its own analysis has confirmed the existence of false data – which it could do with the estimated age information already in its possession, custody, or control – it would find thousands if not millions of minors pretending to be older and adults pretending to be younger. The former would be dispositive as to underage users and indicative for users over 13 as to lack of parental consent, while the latter constitutes predatory behavior.

179.    Moreover, and as was the case with A.F., Meta knows when a single user opens several accounts and uses different birthdates for those accounts, which is highly indicative that the user is underage and/or lacks parental knowledge or consent. For example, and based on just the limited information available to Plaintiff,

      a.    A.F. opened one Instagram Account in August of 2021. Meta recorded her location (city and state of residence) and IP address, among several other data points, and A.F. used her Gmail address and real name. She claimed a March 2003 birthdate.

      b.    A.F. opened a second Instagram account in September of 2021 (at approximately 3:00 a.m.). Meta recorded the same location (city and state of residence) and same IP address, and A.F. used her same Gmail address and name. Only she claimed a February 2001 birthdate.

      c.    A.F. opened a third Instagram account in October of 2021. Meta recorded a different location and IP address, among several other data points, though A.F. used her same Gmail address and name, and provided the March 2003 birthdate again.

In addition to the above identified commonalities among these accounts, Meta recorded the device ID for devices A.F. used to log in which includes a unique ID that is identical across

all three accounts. Meta collected numerous other data points that could and did tell Meta precisely who A.F. was and how she was using Meta's social media products – this is what Meta's systems are designed to do. Each of the above information types (together as well as separately) provide Meta with actual notice each time a minor user opens multiple accounts.

180.     Meta has actual knowledge that a significant percentage of its users are misstating their age and made the calculated business decision to do nothing about it, thereby encouraging other users to do the same. It is commonly understood among teens and pre-teens that Meta will not prevent access to its product even when it knows your real age, which it almost always does – and because Meta wants kids using its product.

181.     Meta did not notify A.F.'s parents of her excessive and unauthorized use. Instead, it programmed its products to start sending A.F. *more* push notifications and directed and amplified content to A.F. that Meta knew would be harmful to her specifically, causing dependency in A.F. on Meta's social media products.

182.     Because of her Meta driven addiction to Instagram, A.F. began spending her nights using the Instagram product and became sleep deprived, causing anxiety, depression, and related exhaustion, stress, and emotional, mental, and development harms as well as increased vulnerabilities. Meta knows that these are harms its products are causing in some percentage of its minor users and makes a calculated business decision to continue providing them with access to its social media products anyway.

183.     Meta has also designed and distributed its product in a manner that makes it impossible for parents to protect their children from it. For example, in addition to staying up late, A.F. began using her device at school instead of focusing on class. She also was able access Meta's products on friend's devices and/or school issued or available devices.

184.     A.F. also began lying to her parents in order to maintain and hide her use of Meta's products.  She went from a good kid who was close with her family, to someone who would do anything to obtain access to Instagram and who began sneaking her use of Meta's products every chance she got. On information and belief, this includes using those products while her parents were in the same room, but when they understood that she was watching videos on-line or playing

games. A.F.'s growing need to access Instagram every chance she got required her to lie, causing feelings of guilt and remorse, and forced her to stay on high alert to avoid detection – causing further harm to A.F. and her family.

185.    The harms proximately caused by Meta's engineered addiction was made worse by the fact that A.F. was only 9 when Meta first began distributing its inherently harmful and dangerous product to her. Meta's abuse and exploitation of A.F. was exacerbated by her age and undeveloped frontal lobe – which also is something Meta has studied. Meta is aware of these physiological differences between its adult and minor users, and its own documents refer to minor users as more "vulnerable" as a result. Of course, instead of taking reasonable steps to avoid doing harm to these users, Meta then makes product change recommendations and decisions designed to exploit such vulnerabilities.

186.    A.F. also and almost immediately began receiving explicit sexual communications and images from adult users, because of Meta's public profile settings, user recommendation technologies, and direct messaging product and product features (including things like disappearing messages and live audio and video. A.F. was messaged and solicited for sexually exploitative content and acts on numerous occasions by adult Instagram users.

187.    These adult users were encouraged by Meta to use its products in this manner, including by Meta's refusal to verify age, identify, and parental consent, to implement email or phone verification, and to implement feasible safeguards to protect minor users from receiving sexually harmful content. But also, Meta's programming decisions are such that Meta is actually rewarding predatory users and essentially serving up to them children that they would not be able to find but for Meta's active assistance.

188.    To name only two examples, Meta's content and user recommendation products identify and recommend content and users, respectively, based on numerous Meta-collected data points (relating to activity on and off its platform) and Meta's specific programming instructions to the technology itself. Because Meta has chosen to program its technologies, even in the case of minor users and suspected predators, to increase engagement at any cost, the more success a predatory user has in exploiting and abusing minors then the more Instagram rewards him.

Instagram rewards him by sending and recommending his content to other vulnerable young girls, and by sending him photos and information identifying new, potential victims – these other users include ones that do not know the predator in real life and may not even have "friends" in common. In other words, he would never have found these users but for Instagram providing him with the equivalent of their name, contact information, and a brief bio confirming that they are just his type.

189.   These outcomes sound extreme, but they are not! They are actual outcomes Meta knows about and has known about for years. The following are some examples of how the above-described technologies work in these discriminatory and harmful ways.

    a.   Adult male user has historically, and successfully, targeted young (under 14) and vulnerable female users. Meta's technology recognizes that this adult male has primarily two types of "friends," which are young girls with certain characteristics and adult males who also favor young girls with certain characteristics. Those characteristics include things like excessive usage, late night usage, certain number of "friends," emotional posts, and/or other factors and usage patterns Meta has identified and knows to be indicative of loneliness and/or insecurities and/or lack of parental oversight. In short, factors indicative of vulnerabilities in young girls. Based on this information, Meta concludes that increasing engagement for this adult male user means finding and providing him with "friend" options for more young girls with similar characteristics, which is what Meta then does. These recommendations include users with no connection with the adult male whatsoever, as well as users who are friends of young girls already "friended" by the adult male because of Meta's recommendations – and in the latter instance, Meta's product and terminology assures the new victims that this adult user is trustworthy (*i.e.* they have "friends" in common).

    b.   Meta's product also determines that this adult user engages for relatively long periods of time with these young female users, including maintaining "friend" or "follow" status for several months, and that his posts garner more reactions from young girls than any other user group. That is, he posts content that is received

(based on Meta's deliberate programming and product design decisions) as popular and frequently "liked" by young girls fitting his preferred profile. Based on this information, and with input from Meta, Meta's product concludes that increasing engagement among young girls can be accomplished by identifying and recommending this user's content to them, which it does – trafficking even more vulnerable children to this user.

190.    Meta has actual knowledge that its user and content recommendation products are causing these exact harms to a significant number of its minor users. Meta employees have reported these findings to leadership. There also are multiple ways Meta could significantly reduce or eliminate these harms, for example, by simply turning of its recommendation product features for minor accounts – which Meta employees have recommended. Meta has opted to do nothing, due at least in part to its mistaken belief that it cannot be held legally accountable for the harms its products are causing and its determination that connecting adult strangers to young children is good for its engagement.

191.    As a proximate result of Meta's addictive design, as well as the predators Meta's products affirmatively directed and recommended to her, and vice versa, and resulting sexually exploitative encounters and abuse she suffered, A.F. developed severe mental health conditions including depression and anxiety, self-harm, suicidal ideation, and physically and mentally abusive behaviors toward her family members.   A.F. is not the same person she was before her unauthorized use of Meta's product began, and these harms coincided precisely with her use of Meta's products.

192.    Meta provided A.F. with access to multiple accounts on Instagram without her parents' knowledge or consent. Her parents do not know or have access to several account usernames, and do not know the exact number of accounts Meta allowed A.F. to open and utilize but believe that there were at least six different accounts A.F. opened – possibly more.

193.    Meta knew or should have known that A.F. was under the age of 13 and obtained multiple accounts under different usernames yet failed to restrict her access or notify Plaintiffs M.F. or B.F. of their daughter's account status and activity.

194.   Plaintiffs M.F. and B.F. also have no way to determine when A.F. opened her first accounts, which information is known only to Meta. Even A.F. herself cannot be certain as to when each account was opened, which uncertainty is the result of Meta's product design. That is, A.F. had to stop using some of her prior Instagram accounts when her phone broke and she got a new one, and because she did not remember her account password and had no way to recover it.

195.   This is a fairly common occurrence for minors to whom Meta provides accounts without parental knowledge or consent, as Meta knows or should know. Specifically, minors trying to hide accounts make up fake email accounts or open new email accounts for the sole purpose of opening an Instagram. They access that account through a portal that remains open on their current device, but once the device is gone and if they do not recall their account password, they become locked out of their Instagram because there is no actual or accessible email address from which they can restore access. Importantly, these minors can then simply open one or more new accounts, which they do – often using the same information since they know that Instagram does not care and will turn a blind eye to use of its product by underage users.

196.   Meta does not discourage this pattern or opening of multiple accounts, often referred to as FINSTA (fake Instagram) or SPAM accounts. Instead, it refers to this as a "unique value proposition" – that is, it has enabled Meta to make millions (if not billions) from engagement it would not otherwise have made if it restricted product distribution to age-appropriate users and minors with parental consent.

197.   Plaintiffs were, however, able to access three of A.F.'s accounts (discussed above), which they immediately accessed then took steps to block A.F. from accessing. These steps include not only changing the phone number and email information on each account so that A.F. could no longer access them, but also taking away A.F.'s phone. M.F. and B.F. cannot be certain that A.F. has stayed off Meta's products, since Meta provides access to minors through any wi-fi enabled device – including school devices, friends' devices, and video game consoles. However, they have done everything in their power to keep her off of them.

198.   In late October of 2021, M.F. discovered that A.F. was using Instagram after walking in on then 10-year-old A.F. engaged in a video chat with an adult male on Instagram. She

was performing sex acts for that adult, Instagram user at the time. M.F. immediately confiscated and searched her phone and discovered the Instagram account, along with two others. Those accounts were opened August 29, 2021, September 12, 2021, and October 14, 2021.  M.F. confiscated the phone, in an effort to prevent A.F. from accessing Instagram and was able to access those accounts himself through her confiscated device.  Based on information contained in the accounts, they had been open for a relatively short period of time, and yet, each account A.F. used for Chats and where she did not delete those Chats included dozens of instances of sexual exploitation and abuse by adult users, many of whom (if not all) found and connected with A.F. because of Meta's products and product features.

199.    On information and belief, all of this data and more resides on Meta's servers and Meta knew or should have known that A.F. was under the age of 13 and was using Meta's social media product without parental knowledge or consent, and that its social media product was affirmatively identifying and directing adult male users to A.F. then making A.F. available to those adult male users via its direct message product, as well as live audio and video product features that are inherently dangerous to minor users.

200.    Meta has actual knowledge that A.F. is under the age of 13. Meta utilizes technology based on the incredible amounts of user data it collects to estimate the actual age of each U.S. user with reasonable certainty. Meta uses this technology for advertising and other revenue generating purposes, then ignores the data when it comes to age restrictions.

201.    But also, shortly after Plaintiff M.F. obtained access to an A.F.'s account in late 2021, he changed her already public facing profile to read: "10 year old who isn't allowed to be on social media."

| Profile Change | |
| --- | --- |
| Changed | Profile Bio Text |
| Previous Value | DONE with life 😔 |
| New Value | 10 Year old who isn't allowed to be on social media. |
| Change Date | Nov 7, 2021, 8:06 PM |

202.    Moreover, the account is set to public,



203.    As of September 2022 – almost a year after A.F.'s age and lack of parental consent was posted to her public profile – the account remains live and publicly viewable.



204.    This is something that happens often. That is, children know and understand that Meta will not block or close their account for being underage. They simply have to say they are at

COMPLAINT                                                                        49

least 13 when signing up and can then publicly tell people their real age, post their real age in their profile, and otherwise announce their real age in postings and comments. It is understood that Meta does not enforce rules that would result in fewer Instagram accounts – and whenever possible, it does not enforce those rules.

205.   During the roughly two months of known and accessible Instagram access (the three accounts to which M.F. and B.F. obtained access), A.F. had horrific and exploitative exchanges with countless Instagram users – the total number is not known and, in fact, as of now, only Meta itself has access to all of A.F.'s accounts. Plaintiff is sending Meta a request concurrent with the service of this Complaint for copies of the communications his 10-year-old child had with strangers on Instagram and because of Instagram's product features.  On information and belief, Meta will not provide that information to M.F. It has been Meta's position in other litigation that 10-year-old children and adult strangers are entitled to engage in private conversations outside the purview of parents, and that the parents of a 10-year-old have no legal right to communications occurring on Meta's products between their child and strangers – including where the parent never consented or had any knowledge of such use.

206.   Meta is actively interfering with parental rights and actively preventing parents and authorities from protecting other children from dangerous sexual predators that Meta knows or recklessly disregards as using its Instagram product to engage in commercial sex acts with minors.

207.   Moreover, Meta designs and programs its products such that, when a female user under the age of 18 creates an account (and regardless of the age she identifies while opening the account), that user is almost immediately bombarded with explicit messages and marketing via Meta's direct message product. The reason for this relates to a combination of Meta defaulting accounts to public, and making minor accounts searchable, as well as Meta's user and content recommendation features, which essentially serve as a form of advertising and trafficking whereby predators can either search for and find new, young, female Instagram users or have those users presented to them by Meta's product.

208.   Pedophiles who talk about their in-person methods describe approaching minors to test whether they will be vulnerable to grooming and exploitation.  They get into a minor's space

and when a child immediately pulls away a pedophile knows to not pursue things. But when a child hesitates or leans in, a pedophile knows that the child is hungry for attention and, thus, vulnerable to grooming and abuse. Meta's products have changed things in the most dangerous and harmful ways imaginable, making it unnecessary for predators to look for and test vulnerable children in public settings.

209.    Instead, Meta designed its products in a manner that identifies and serves up millions of children for Meta's predatory users, then provides them with privacy and effective communication tools that greatly reduce the chance of getting caught. Meta knows that its products are designed in a manner that encourages and allows these harms.  For example, Meta provides its predatory users with an unlimited number of potential victims, including by marking to and addicting children and teens, by not verifying age, by allowing multiple accounts, and by not using information in its possession to enforce its own terms with regard to underage users, like A.F. Meta then helps identify vulnerable child users, and provides Meta predators with access to those children, plus protection from getting caught. For example, Meta does not verify user identity, email address, or phone number, and actively encourages users to open multiple account, all of which allows Meta predators to interact with children via anonymous or semi-anonymous accounts. Meta then actively encourages new users (including minors) to connect with strangers on its platform. Meta actively recommends and matches vulnerable children with adult users via Meta's collection of and decision to utilize every data point imaginable from every user, again including kids. Meta further claims and convinces its minor users that its product is safe, while addicting them to the point where they have to lie to their parents to obtain access.  These children cannot disclose their use of Instagram (or even usernames) to their parents for fear that they will lose access to Instagram. These same mechanisms, however, directly create a situation in which children both believe they are safe and are actively discouraged by Meta from reporting predatory interactions when those occur. Moreover, Meta does not verify age or require users to be honest about their age or identity, such that in many cases children do not even realize they are interacting with adults. Lastly, unlike traditional predator approaches, Meta's product features make it easy to keep trying.   Meta's public profile settings, multiple account offerings, direct messaging

products, and disappearing/live communication tools allow predator users to try again and again, until children who might otherwise have pulled away give in – and all without any appreciable risk of getting caught, because of how Meta develops, designs, manufactures, operates, and distributes its Instagram product.

210.    Meta knows that its products are designed in a manner that encourages and allows these harms. Meta employees have identified these types of harms and causal connections to specific Meta products and settings. Meta was aware of changes it could make at nominal time and expense but opted for engagement over the safety of its minor users.

211.    As Meta knows, minor users of its products more often than not lack the cognitive ability and life experience to identify dangerous and exploitative behaviors and the psychosocial maturity to decline invitations to exchange salacious material. Children are, in Meta's own words, "vulnerable." Instead of protecting them, Meta uses them to make money by luring and engaging the predators who prey on them.

212.    One example is Meta's PYMK product which Meta's own research has found to have historically contributed to up to 75% of the adult minor grooming that happens on Meta's platforms.[21] Meta has actual knowledge that its PYMK/SY products connect minors to predators – predators they would never have met but for Meta's product and its programming decision to actively identify and encourage those predators to connect with those children, and vice versa. This is literally what Meta is doing, and at least some employees have expressed serious concern about the fact that Meta has not simply turned off its user recommendation product, at least as it relates to minor accounts. Meta continued to operate PYMK/SY in connection with minor accounts regardless.

213.    Moreover, A.F. was harmed specifically *because* of Meta's user recommendation products.

214.    Meta recommended A.F.'s profile to several adult predators using its Instagram product, and A.F. was connected with and abused by those predators as a result. In one instance,

---

[21] On information and belief, these product defects and/or inherently dangerous features are present in both the PYMK and SY products, though the Meta studies and findings referenced refer to PYMK.

an Instagram predator told A.F. that this is how he found her.

215.    On October 16, 2021, Instagram user **Johnny** initiated contact with A.F. and wrote "heyyy." He introduced himself as "houzi from highrise," and asked if this was "another acc you have?" A.F. said yes, she has to "use this one now." He said, "it's fine honey" and told her he only "found [her new account] on account of my recommended lol."

**Johnny**

found it on accident on my recommended lol
Oct 16, 2021, 3:32 PM

Okie
Oct 16, 2021, 3:32 PM

**Johnny**

it's fine honey
Oct 16, 2021, 3:32 PM

Btw
Oct 16, 2021, 3:32 PM

Vtw
Oct 16, 2021, 3:32 PM

I have to use this one now bte
Oct 16, 2021, 3:32 PM

Yess
Oct 16, 2021, 3:31 PM

**Johnny**

is this another acc you have? ^^
Oct 16, 2021, 3:30 PM

216.    Incredibly, Meta's user recommendation product directed predatory user **Johnny** to another one of A.F.'s secret accounts just a few days later,

1

2

3

4

5

6

7



8   This predatory user would quite literally not have been able to locate A.F. as she opened each new

9   account, in efforts to hide her use from her parents, but for Meta's recommendation product –

10  which kept telling him exactly how to find her.

11          217.    Instagram **Johnny** knew that A.F. was a minor. They discussed things like her

12  being sad about something her sister said, in response to which **Johnny** asks, "can't you tell your

13  parents about it" and "your parents should be the ones to correct her … sucks they don't." **Johnny**

14  tells A.F. that "for now … better to get distracted ok … don't worry about the dumb people …

15  there are a lot of them around x)." **Johnny** then says he is going to cheer her up, which he does by

16  telling her that he "just took a shower and I'm laying on my bed [and] … I would cuddle with you

17  if I could." He proceeds to engage A.F. in graphic role play ("RP") sex video calls 10-year-old

18  A.F. so she can watch him "cum."

19

20

21

22

23

24

25

26

27

28



218.    A.F. says she cannot talk by video but sends him a photo so he can "finish."

Again, Meta's product features are such that the "pic" itself no longer exists, but it is clear from the chats A.F. saved that an explicit photo was solicited and then exchanged,



219.     Over the course of a few days A.F. sent **Johnny** several photos of her face, and

additional, more explicit photos – most of which are not viewable because of Instagram's photo

and/or privacy features. **Johnny** did not ask A.F.'s age until two days after they engaged in the RP

sex described above, in response to which A.F. says "18." Though A.F. sends photos of her and

her family and engages in video and audio chats with **Johnny**.

220.     Between October 14 and October 20, 2021, A.F. exchanged a series of messages

with Instagram user **Alex Hannah**.  **Alex Hannah** identified himself as a 20-year-old male from

Edinburgh. **Alex Hannah** solicited A.F. for naked photos and cybersex and began grooming her.

He told A.F. that he loved her and that he was the only one who could make her feel good. On

October 16, 2021, he sent her a video of himself urinating, zoomed in on his penis and the toilet.

A.F. and **Alex Hannah** also exchanged several explicit photos (which disappeared due to Instagram's privacy product feature or similar) and engaged in several video chats, during which **Alex Hannah** sexually exploited and abused A.F.

221.    **Alex Hannah** sent the following types of explicit messages to 10-year-old A.F.,

**Alex Hannah**
Baby how wet is ur pussy just now
Oct 17, 2021, 7:10 AM

**[A.F.]**
Hehe
Oct 17, 2021, 7:10 AM

**Alex Hannah**
I really want to fuck u
Oct 17, 2021, 7:08 AM

            ...

**Alex Hannah**
And I know how much u want to see me naked on call
Oct 17, 2021, 9:30 AM

**[A.F.]**
........
Oct 17, 2021, 9:28 AM

**Alex Hannah**
And ill even show u it on call
Oct 17, 2021, 9:26 AM

**Alex Hannah**
Please baby ill send more cock
Oct 17, 2021, 9:26 AM

**[A.F.]**
...
Oct 17, 2021, 9:25 AM

**Alex Hannah**
Don't make me beg to see u fully naked
Oct 17, 2021, 9:25 AM

**[A.F.]**
..
Oct 17, 2021, 9:24 AM

**Alex Hannah**
Please
Oct 17, 2021, 9:24 AM

**[A.F.]**
Heh
Oct 17, 2021, 9:23 AM

**Alex Hannah**
Oct 17, 2021, 9:22 AM

COMPLAINT                                                                    57

**[A.F.]**
Idk can u
Oct 17, 2021, 9:21 AM
**Alex Hannah**
Can I see ur tits
Oct 17, 2021, 9:21 AM

222.    On October 20, 2021, **Alex Hannah** and A.F. moved their chats to another of A.F.'s Instagram accounts. **Alex Hannah** engaged A.F. in similar grooming and exploitation activities through this second account, and even said that he would come get her, in response to which A.F. provided him with her home address.

223.    Had Meta limited users to a single account, this grooming and exploitation would not have occurred – in fact, such a minor product change would exponentially reduce the grooming and exploitation occurring because of the Instagram product. For example, minor users with parental consent for a single (often supervised) account would not be able to create secret accounts without parental knowledge and consent, while minor users who lack consent could not open additional accounts with each new parental discovery and/or device replacement.  Meta does not, however, limit its users (even minors) to one account.

224.    On October 26, 2021, A.F.'s father obtained access to the Instagram account being used by **Alex Hannah** and A.F. to communicate and confronted **Alex Hannah**, demanding that he cease all communications with A.F.,

10 years old girl. I am her father. Cease communications immediately.
Oct 26, 2021, 7:53 PM

At first, **Alex Hannah** did not believe him, so he said it again,

10 years old girl. I am her father. Cease communications immediately.
Oct 29, 2021, 10:22 AM

**Alex Hannah**
Hey baby girl
Oct 27, 2021, 10:17 AM

This time **Alex Hannah** asked to speak with A.F. directly, in response to which M.F. threatened to call the police,

> ████████
>
> No. Her Instagram accounts are done. She is a 10 year old girl getting exploited and receiving explicit materials. I am her father and it stops now or the police will be notified.
> Oct 29, 2021, 10:27 AM
>
> **Alex Hannah**
>
> Can I speak to her please
> Oct 29, 2021, 10:25 AM

Apparently convinced, **Alex Hannah** attempted to excuse his exploitation and abuse of 10-year-old child by saying that she told him she was 15,

> **Alex Hannah**
>
> Well she said she was 15
> Oct 29, 2021, 10:28 AM

225.    However, and because Meta allows multiple accounts, **Alex Hannah** then tried to re-initiate contact with 10-year-old A.F via her prior Instagram account on November 27, 2021,

> **Alex Hannah**
>
> Hi
> Nov 27, 2021, 3:14 PM

Unbeknownst to **Alex Hannah**, M.F. and B.F. had discovered and obtained access to that other account as well, such that *that* attempt to reinitiate was unsuccessful. However, in a situation where Plaintiffs had not discovered the second account (as often happens), Meta's business decision to allow and encourage multiple (secret) accounts would have been the means through which **Alex Hannah** continued his exploitation and abuse. Meta has actual knowledge that its product is inherently dangerous in this precise way.

226.    Plaintiffs also have no way to know whether **Alex Hannah** has contacted A.F. via other, not yet discovered Instagram accounts. While Plaintiffs have taken away A.F.'s phone and

do everything they can to monitor and prevent access to Instagram, Meta does not actual limit its distribution of Instagram to children over 13 or take any steps to prevent unauthorized use by minors.  Meta makes it impossible for parents to prevent use by their children, short of 24-hour surveillance.

227.     Between October 23 and October 26, 2021, A.F. exchanged a series of messages with Instagram user **Andrew**, who quickly began telling A.F. how beautiful she is to coax her into sending him explicit material.  He asked her, "If we were alone together what would you do to me," to which A.F. responded, "tbh [to be honest] idk [I don't know]."  In an attempt to escalate, Andrew then asked if A.F. wanted to "play truth or dare." When she did not respond, he proceeded to message her several times and tried to initiate an audio call.  The next morning A.F. wrote back telling him, "Hey sorry, I fell asleep," to which **Andrew** responded, "would you like to see something big," and A.F. said, "Sureeeee."  **Andrew** proceeded to send 10-year-old A.F. a photo of his penis, then solicited photos from A.F., which she sent, including one of herself topless.

228.     **Andrew** again attempted to immediately escalate with 10-year-old A.F., and again began harassing her in response to which she stopped responding,

> **Andrew**
> ??????
> Oct 24, 2021, 7:21 AM
> **Andrew**
> Why are you ignoring me I thought you liked me and I was perfect
> Oct 24, 2021, 7:19 AM
> **Andrew**
> I can see you reading my messages
> Oct 24, 2021, 7:19 AM
> **Andrew**
> Why are you ignoring me
> Oct 24, 2021, 7:18 AM
> **Andrew**
> Babe?
> Oct 24, 2021, 7:16 AM
> **Andrew**
> ????
> Oct 24, 2021, 7:12 AM
> **Andrew**
> Why aren't you talking to me
> Oct 24, 2021, 7:11 AM
> **Andrew**

Babe?
Oct 24, 2021, 7:09 AM
**Andrew**
Do you use ur fingers or something else
Oct 24, 2021, 7:07 AM
**[A.F.]**
Yeah
Oct 24, 2021, 7:07 AM
**Andrew**
?
Oct 24, 2021, 7:06 AM
**Andrew**
Can I see you masturbate bsby
Oct 24, 2021, 7:04 AM
**[A.F.]**
Idk
Oct 24, 2021, 7:04 AM
**Andrew**
I wish I could bend you over
Oct 24, 2021, 7:03 AM

In response, A.F. told him that she was busy. She also told him that she was upset, in response to which **Andrew** again and immediately attempted to escalate the discussion, including by sending her a photograph of his penis again and with the message, "Plus you have this."  He then asked her for a "favor" … "Can I see you masturbate until you cum." And again, A.F. was uncertain and clearly did not want to engage in these activities with **Andrew**, in response to which **Andrew** tried pressuring and manipulating her into agreeing,

**[A.F.]**
Hy
Oct 24, 2021, 12:04 PM
**Andrew**
Hey baby
Oct 24, 2021, 12:02 PM
**Andrew**
So pls baby
Oct 24, 2021, 7:37 AM
**Andrew**
I'll even send a video of me masturbating
Oct 24, 2021, 7:36 AM
**Andrew**
Just this one time can you pls help me
Oct 24, 2021, 7:35 AM

COMPLAINT                                                                 61

**[A.F.]**
Idk
Oct 24, 2021, 7:35 AM
**Andrew**
I promise
Oct 24, 2021, 7:35 AM
**Andrew**
Babe I will never ask you to do something like this again
Oct 24, 2021, 7:35 AM
**[A.F.]**
Idk
Oct 24, 2021, 7:35 AM
**Andrew**
I'm hard and for some reason it hurts
Oct 24, 2021, 7:34 AM
**Andrew**
Pls
Oct 24, 2021, 7:34 AM
**[A.F.]**
Idk
Oct 24, 2021, 7:33 AM
**Andrew**
Can I see you masturbate until you cum
Oct 24, 2021, 7:33 AM
**[A.F.]**
Ig
Oct 24, 2021, 7:33 AM
**Andrew**
Can I ask a favor baby
Oct 24, 2021, 7:33 AM

229.    Children like A.F. do not have the experience or ability to fend off predators like **Andrew**, who engaged in the above-described pattern relentlessly – conversing with A.F., then escalating, then demanding sexual favors, then harassing when she stops responding, then engaging and immediately escalating again. A.F. expressed uncertainty several times and told him she did not know and was not sure if she wanted to engage with him, so **Andrew** kept pressing until she succumbed.

230.    The next time A.F. messaged, **Andrew** sent her the photo of his penis for a third time, with the message, "I love you" then "oops ; )"  He then asked her to send him "something special," in response to which A.F. sent a photo of her genitals.  **Andrew** immediately escalated

and began telling A.F. to send him videos of her masturbating, which she eventually did.  On information and belief, that content is still on Meta's servers, and Plaintiffs have reported the content and a number of adult male Instagram users who abused A.F. through and because of Meta's Instagram product to the National Center for Missing and Exploited Children (NCMEC).

231.     On October 26, 2021, A.F.'s father obtained access to the Instagram account being used by **Andrew** and A.F. and confronted **Andrew**, telling **Andrew** that A.F. is only 10. In response, Andrew lies and says, "Umm I'm 11 … She sent me stuff and I just went on Google to send her fake stuff sir."  **Andrew** says he will cease communications with A.F.

> **Andrew**
>
> She sent me stuff and I just went on Google to send her fake stuff sir
>
> Oct 26, 2021, 7:37 PM

> **Andrew**
>
> Umm I'm 11
>
> Oct 26, 2021, 7:37 PM

232.     M.F. and B.F. believe that one of the first Instagram Users who exploited and abused A.F. was a user with the username **Dayln hickman**. M.F. and B.F. found messages from Dayln hickman to 10-year-old A.F. that included dick pics, face shots, and sexual descriptions. He then coerced A.F. to send him nude pictures in return, which she did, and obtained her phone number, through which he began messaging her directly on her cell phone device. M.F. and B.F. changed A.F.'s phone number upon discovering this, and in the hopes of protecting their daughter from **Dayln hickman**.  Plaintiffs have reported this Instagram user to NCMEC.

233.     Multiple users convinced A.F. to send them explicit photos and videos, and to otherwise engage in sexting and live audio and video sessions through promises of compensation. These users knew that A.F. was a minor, as did Meta.

234.     For example, Instagram username **Mi Kee** promised to "take care" of A.F. and to take her to "Miami Beach every Sunday," in exchange for explicit photos and video.[22] When A.F.

---

[22] A.F. and **Mi Kee** reference another account used by A.F. as well, however, M.F. has no knowledge of or access to that other account. On information and belief, contents from that account will be on Meta's server and will include similar types of exploitation and abuse between A.F. and Username **Mi Kee**.

tells **Mi Kee** that she will not be allowed to have social media accounts once she gets her new phone, and specifically, because her parents will not allow it, **Mi Kee** responds that her parents only want the best for her. He then sends her his phone number and tells her that they can continue their discussion via phone, though he is "not happy bout it …"

235.    Predators use Meta's direct message feature to abuse minors for multiple reasons, all of which relate to the fact that Meta designs and provides access to its product in a manner that makes it far less likely for the abuse to be discovered. For example, Meta provides its direct message product in connection with minor accounts, which product also allows for disappearing message options as well as live audio and video communication. These product features and the sheer number and potential connections are not features to which a minor has access via standard cell phone functionality, nor are they products most parents would allow for their minor children if the true nature of dangers of such products had been disclosed. These same minors also do not provide their parents with access to their accounts, particularly their FINSTAs, which as Meta and the predators who use Meta products know, are hidden from and unknown to parents in most cases. In short, Meta designs, operates, and makes its social media products available to children in a manner that makes it exponentially harder for parents to protect them from exploitation and sexual abuse. This is deliberate, as designing Meta's products to protect children and enforce its stated age limitations would mean less revenue for Meta, as well as underage, unauthorized, and predator users moving to certain competing social media platforms – which platforms also currently operate without scruples. Moreover, even when these Instagram predators are caught, most if not all of the evidence is typically long since deleted or was never saved due to the product features Meta makes available in its Direct Message product.

236.    Some of these product features are ones Meta designed and began incorporating into its social media products only after its competitor, Snap Inc., began marketing and using these features in its own product, Snapchat.

# What is My Eyes Only and how does the My Eyes Only password work?

You must be aware of the My Eyes Only tool only if you use Snapchat. Although the well-known multi-media app has experienced a drop in the active user numbers in the second quarter of 2018 after a steady rise since its launch in 2011, it still has 188 million daily active users, and it is still one of the most popular social networking apps in the world. The app makes it easy for users to send short video clips, images, and messages, and it gained popularity fast because of its "disappearing" content feature. Once the video, image, or message was sent, it could be viewed once and for a short period only. Since the creation of Snapchat, such social media giants as Facebook and Instagram have presented their own versions of Snapchat, and that is, in part, why users have not only not been joining Snapchat, but also leaving it behind. The company needs to reinvent itself all the time to offer the most attractive services, and My Eyes Only is one of the latest features that were created to offer just that.

https://www.cyclonis.com/cannot-recover-my-eyes-only-password-do-something-not-forget/

These product features are not essential to operation of these social media products. Instead, children are being exploited, abused, and mentally and physically harmed because Meta and a small elite of the world's largest social media companies – such Snap Inc. and TikTok/ByteDance – are engaged in a race to the top, at any cost.

237.    Meta has actual knowledge that this exploitation and abuse is happening on and because of its social media product, which is discussed at length in internal Meta documents. Meta documents also discuss just some of the many product changes it could make quickly and cheaply to protect its minor users, but in virtually every case, Meta made the business decision to forgo safety measures in favor of increasing minor and adult engagement instead.

238.    On October 26, 2021, A.F.'s father obtained access to the Instagram account being used by **Mi Kee** and A.F. and confronted **Mi Kee**, telling **Mi Kee** that A.F. is only 10.

10 years old girl. This is her father. Cease communications.
Oct 26, 2021, 7:43 PM

239.    **Mi Kee** kept messaging, so M.F. told him again on October 29, 2021,



10 years old girl. This is her father. Cease communications.
Oct 29, 2021, 10:21 AM

240.   **Mi Kee** continued messaging and tried to call via Meta's audio call product several times in quick succession,

Mi Kee
Audio call ended
Nov 4, 2021, 10:13 AM                                                    Duration: 52 seconds

Mi Kee
Mi Kee started an audio call
Nov 4, 2021, 10:12 AM

Mi Kee
Audio call ended
Nov 4, 2021, 10:10 AM                                                    Duration: 41 seconds

Mi Kee
Mi Kee started an audio call
Nov 4, 2021, 10:09 AM

Mi Kee
Video chat ended
Nov 4, 2021, 10:09 AM                                                    Duration: 23 seconds

Mi Kee
Mi Kee started a video call
Nov 4, 2021, 10:09 AM

Mi Kee
U mad at me
Nov 1, 2021, 11:40 AM

Mi Kee
Hey baby
Oct 31, 2021, 12:33 PM

241.   M.F. told him again on November 4, 2021,

I done told you. She's a 10 year old who is not allowed having social media.
Nov 4, 2021, 10:26 AM

242.   **Mi Kee** apologized, then stopped trying to initiate contact with A.F. – until six

months later, when he tried again (presumably thinking that A.F. would have been able to obtain unauthorized access by that time),

> **Mi Kee**
>
> Hi
>
> May 15, 2022, 1:25 PM

243.     Instagram usernames **n i x k** and **monk51401** solicited explicit photos and videos from A.F., which they received via Meta's disappearing messages features. **monk51401** promises 10-year-old A.F. that she "will get something later" and "a nice surprise" in exchange for sending him explicit videos, which she appears to do based on his responses to disappearing messages (which Plaintiff does not include here due solely to the explicit nature of the direct messages themselves).

244.     Instagram users like **Khiee**, **balle_rose2243**, and **Jamesbeames** exchanged explicit photos and videos with 10-year-old A.F. and engaged in virtual sex with A.F. through and because of Meta's Instagram Direct Message product.

245.     Meta's disappearing photos and similar features also make it exponentially more difficult for parents and authorities to protect minors. For example, Instagram users like **Jamesbeames** and **Gud Boi** solicited and received topless photos of A.F.  It is clear from the context of the chats that the photos were sent and received, while the photos themselves are no longer available through A.F.'s account. For example,

> **Jamesbeames**
> Nice tits your turn
> Oct 15, 2021, 10:44 PM
> **[A.F.]**
> Oct 15, 2021, 10:44 PM
> **Jamesbeames**
> I dare you to show me your tits
> Oct 15, 2021, 10:42 PM
>
> **Gud boi**
> ok show me your face
> Oct 17, 2021, 10:02 AM
> **Gud boi**
> Gud boi started a video call
> Oct 17, 2021, 10:02 AM

**[A.F.]**
Hi
Oct 17, 2021, 9:59 AM
**[A.F.]**
Ji
Oct 17, 2021, 9:59 AM
**Gud boi**
reply 🥺🥺
Oct 17, 2021, 9:58 AM
**Gud boi**
no problem
Oct 17, 2021, 9:46 AM
**Gud boi**
so can I see your boob's live?
Oct 17, 2021, 9:46 AM

A.F. does not want to show **Gud boi** her face, so a few minutes later he asks, "Can I see your boobies again?"  A.F. was 10 when these direct messages were being exchanged. Meta claims to have technology that detects explicit photo and video content, yet in a matter of only a few days, A.F. was sending and receiving countless explicit and exploitative photos and videos. Meta was recommending her to adult male Instagram users, as it programmed its products to recognize and exploit the fact that she was engaged in active and extensive direct messaging and/or other interactions with adult make Instagram users. Meta was providing her and the dozens of predators it directed to her with live video and disappearing photo products, and Meta was making money for every illegal interaction that took place. Despite its claims of having technology designed to protect children like A.F. and ample evidence in her account-based activities of the same, Meta did nothing to protect A.F. and, instead, encouraged and provided her with multiple accounts and access despite lack of parental authority or consent.

246.    Meta does not care about the harms it causes its minor users. It only cares about its bottom line, and children like A.F. are the price Meta is willing to pay.

247.    Between October 18 and October 19, 2021, A.F. chatted with another Instagram User, whose name currently is unknown to Plaintiff but is or should be known to Meta ("Unknown User No. 1"). **Unknown User No. 1** identified himself as a 29-year-old male and engaged in

several audio calls with 10-year-old A.F. **Unknown User No. 1** became agitated anytime A.F. did not respond quickly to him, threatening to block A.F. or ignore her "forever" of she continued to not respond to him immediately. He also coaxed her into doing things by telling her she would if she "truly love[d]" him. **Unknown User No. 1** asked A.F. to "Marry me and move in with me." He told her to prove that she loved him by giving him her Snapchat name, in response to which she said that she could not because she did not have a "Snapchat account."

248.    On October 23, 2021, A.F. engaged in the following exchange with another Instagram User, whose name currently is unknown to Plaintiff but is or should be known to Meta ("Unknown User No. 2"):

> **Instagram User**
> Yea sure!
> Oct 23, 2021, 1:00 PM
> **[A.F.]**
> Um well thank you, but I'm not interested we can still chat if you'd like to!
> Oct 23, 2021, 12:59 PM
> **Instagram User**
> Hello beautiful I love your profile picture especially I'll be happy if you text me back, I'm a sugar daddy I'm interested in having you as my sugar baby and get you paid weekly my payment start from $5000 lmk if you're interested love ❤️
> Oct 23, 2021, 12:57 PM

249.    The above are just some examples. Plaintiff does not have access to several of A.F.'s Meta accounts, which information is known only to Meta.

250.    On information and belief, those accounts also contain Child Sexual Abuse Material and evidence of exploitation, abuse, grooming, and commercial sex acts, all of which were facilitated, enabled, and encouraged by Meta's product features. Meta quite literally recommended A.F. to sexual predators she did not know and would not have come into contact with but for Meta and its product design and programming decisions. And with each recommendation, Meta made more money at A.F.'s expense.

251.    Meta is doing this to millions of young girls at this very moment, with full knowledge of what it is doing and under the belief that our current legal system does not know enough about its products and is otherwise not equipped to stop it. Meta's actions have long since surpassed mere negligence, and well into the realm of nefarious. Meta continues gaslighting the

world, including its into blaming parents for harms Meta has carefully and deliberately designed its products to slip past parents entirely.

252.    Moreover and because of Meta's refusal to act, it has connected most if not all of the predatory users it led to A.F. to other children and most if not all of those users are still actively engaging in commercial sex acts with Meta's assistance and to Meta's benefit.

253.    The Instagram account A.F. opened in September 2021 was active for just over one month, during which time A.F. exchanged hundreds if not thousands of messages through Meta's product and interacted with at least **twenty-five** other Instagram users. Those were people A.F. did not know in real life and most if not all of those users exploited, abused, and/or engaged in commercial sexual acts with A.F.

254.    The Instagram account A.F. opened in October 2021 was active for less than two weeks, during which time A.F. exchanged hundreds if not thousands of messages through Meta's product and interacted with at least **forty-four** other Instagram users. Those users were people A.F. did not know in real life and most if not all of those users exploited, abused, and/or engaged in commercial sexual acts with A.F

255.    Again, these are just two of six or more accounts Meta provided to A.F. without her parents' knowledge or consent.

256.    A.F.'s parents attempted multiple times to reduce or limit his daughter's use of social media. Initially they did not know that she was using social media at all.

257.    Regardless, and because of her addiction to Meta's product, efforts at exercising Plaintiff's parental rights and authority by restricting cell phone access caused a severe reaction by A.F. Ultimately, after the incredibly harmful use of just some of the Instagram accounts was discovered, A.F.'s parents had to start taking away her phone and other devices – which left A.F. without a means to contact them and without a phone when at school or otherwise outside their control. It also risked serious, even fatal harm, to A.F. – unbeknownst to her parents – and because the seriousness of the addiction Meta has cultivated in millions of U.S. children and teens has led to self-harm and suicide when access to its social media products is removed.  Plaintiffs know of at least two pending lawsuits where minors died by suicide shortly after access to Meta's social

media products was denied, and on information and belief, medical professionals around the country have just started to identify this harm as one caused by certain social media products, including the one at issue in this case.

258.     Moreover, because Meta has decided to provide access to its product to anyone and anywhere, A.F.'s parents cannot actually stop her from using Instagram short of hospitalization and/or 24-hour observation. She is able to access Instagram via friends' devices and/or other devices to which she obtains access while at school and outside of her parents' control. Meta has created an untenable situation for parents and is causing incredible harm to children and their families as a direct result – which harms are known to Meta.

259.     Through her use of Instagram, A.F. was messaged and solicited for sexual and exploitive content and acts, as well as commercial sex acts, on numerous occasions by adult users of Instagram, who are encouraged to use this product to sexually solicit and abuse minors due to Meta's refusal to verify identity and age for new users as well as certain product features utilized by Meta in connection with minor accounts, *i.e.* user recommendations, direct messaging, and public profile settings.

260.     As a proximate result of A.F.'s addictive, problematic, and sexually exploitative encounters on Instagram, she developed numerous mental health conditions including self-harm, severe depression and anxiety, suicidal ideation, and physically and mentally abusive behaviors toward her parents and siblings.

261.     M.F. and B.F. have sought and obtained mental health treatment for A.F. on multiple occasions.  They currently are taking A.F. to a counselor every week, in addition to which they have had to purchase an abundance of different locks, locking cabinets, and lock boxes to protect A.F. and keep her safe at both residences. A.F. has become suicidal as a result of the mental and physical harms the Instagram product caused her, and her parents fight every day to keep her alive and to get her the help she needs.

262.     But for Meta's failure to conduct reasonable verification of age, identity, and/or parental consent, A.F. would not have been exposed to Instagram's inherently dangerous and defective features and design.

263.   But for Instagram's designed addiction and dependency, A.F. would not have experienced the sleep deprivation, anxiety, and depression, self-harm, suicidal ideation, and sexual exploitation and abuse that comes from the sheer volume of harmful content and addictive features Meta purposefully directs to minor users, and directed to A.F.

264.   These are consequences Meta anticipated, foresaw, and knowingly risked for A.F. and tens of millions of children like her, which risks Meta did not have the right to take. Moreover, these are harms A.F. and her parents did not know about, and could not have discovered in the exercise of reasonable diligence because of Meta's deceit and obfuscation. Meta made statements and issued materials aimed at assuring the world that its products were safe and not-addictive to children and teens, despite its actual knowledge to the contrary.

265.   A.F. is still suffering because of the mental and physical harms Instagram has caused. She has lost several, formative years of her childhood because of Meta's social media product and will carry the burden of these mental and physical harms for the rest of her life. At this point, it is not clear whether or how A.F.'s parents can most effectively – if at all – help her to recover from the severe sexual exploitation and abuse she suffered because of Instagram.

## VII.   PLAINTIFF'S CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

266.   Plaintiffs reallege each and every allegation contained in paragraphs 1 through 265 as if fully stated herein.

267.   Meta's product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Meta and the omission of the alternative design renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injury.

268.   Meta designed, manufactured, marketed, and sold a social media product that was unreasonably dangerous because it was designed to be addictive to the minor users to whom Meta actively marketed and because the foreseeable use of Meta's product causes mental and physical

harm to minor users.

269.    Meta's product was unreasonably dangerous because it contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Meta solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on its product.

**A.    Inadequate Safeguards from Harmful and Exploitative Content**

270.    As designed, Instagram recommendation technologies and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Meta's social media product. The cost of designing Meta's algorithms to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

271.    Meta also engages in conduct, outside of the algorithms themselves, that is designed to promote harmful and exploitative content as a means of increasing its revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Meta at the direct cost of user wellbeing.

272.    Reasonable users (and their parents) would not expect that Meta's product would knowingly expose them to such harmful content and/or that Meta's product would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Meta has and continues to knowingly use its algorithms on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Meta's youngest users, like A.F.

**B.     Failure to Verify Minor Users' Age and Identity**

273.     As designed, Meta's product is not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

274.     Adults frequently set up user accounts on Meta's social media product posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

275.     Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Meta's social media product and pose as minors for malign purposes.

276.     Likewise, minor users who are under the age of 13 and/or whose parents have taken affirmative steps to keep them away from Meta's product often open multiple accounts, such that Meta knows or has reason to know that the user is underage and/or does not have parental permission to use its product. Meta already has the information and means it needs to ascertain with reasonable certainty each user's actual age and, at least in some cases, Meta utilizes these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They simply choose to do nothing about that information as it relates to the specific, underaged users themselves.

277.     By way of example only, Meta has dashboards that enable it to identify and track every detail of user activity by date, location, and age—not the age provided to Meta upon account opening, but rather, "Age prediction" technologies Meta has developed and that can determine age with reasonable certainty based on user data, online activity, and/or similar sources of information Meta collects with regard to every Meta user on a constant and ongoing basis.

278.     Again, Meta exercises an unprecedented level of control over its users and possesses and unprecedented level of knowledge—including the estimated actual age of each user, irrespective of what a user states when opening an account. Meta cannot, in good faith, disclaim knowledge or responsibility for the harms its social media product is causing, including the harms it caused to A.F. and that are at issue in this Complaint.

279.     Moreover, reasonably accurate age and identity verification is not only feasible but

widely deployed by online retailers and internet service providers.

280.    The cost of incorporating age and identify verification into Meta's product would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Meta's product.

**C.    Inadequate Parental Control and Monitoring**

281.    Meta's product is also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

282.    Meta's product is designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.    Intentional Direction of Minor Users to Harmful and Exploitative Content**

283.    Default "recommendations" communicated to new minor users, including A.F., purposefully steered her toward content and users Meta knew to be harmful to children of her age and gender.

284.    Ad content pushed to new teenage users, including A.F., because of her age and vulnerability, purposefully steer those users toward content Meta knows to be harmful to children of her age and gender.

**E.    Inadequate Protection of Minors from Sexual Exploitation and Abuse**

285.    Meta's product is not reasonably safe because it does not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

286.    Parents do not expect their children will use Meta's product to exchange sexually explicit content and images, and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

287.    Minor users of Meta's product lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and lack the psychosocial maturity to decline

invitations to exchange salacious material.

288.   Meta's product is unreasonably dangerous and defective as designed because it allows minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Meta's integrated design features.

289.   Meta's product is unreasonably dangerous and defective as designed because it allows strangers to contact minor children via direct message products and allows children to engage with strangers using products such as direct messaging, disappearing, and live audio and video.

**F.   Design of Addictive Social Media Products**

290.   As designed, Meta's social media product is addictive to minor users as follows: When minors use design features such as "likes" it cause their brains release dopamine which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Meta's algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

291.   Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as, a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or

moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

292.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

293.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is.  Addictive social media use is manifested when a user (1) becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

294.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media.  BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

295.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

a.   You spend a lot of time thinking about social media or planning how to use it.

b.   You feel an urge to use social media more and more.

c.   You use social media in order to forget about personal problems.

d.   You have tried to cut down on the use of social media without success.

e.   You become restless or troubled if you are prohibited from using social media.

f.   You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

296.   Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

a.   Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when the device is taken away or access is not possible (sadness, anxiety, irritability), including,

b.   Tolerance, the need to spend more time using social media to satisfy the urge.

c.   Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.   Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

COMPLAINT                                                                                      78

e.      Continuing to use social media despite problems.

f.      Deceiving family members or others about the amount of time spent on social media.

g.      The use of social media to relieve negative moods, such as guilt or hopelessness.

h.      Jeopardized school or work performance or relationships due to social media usage.

297.    Meta's advertising profit is directly tied to the amount of time that its users spend online, and its algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Meta enhances advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

298.    It is feasible to make Meta's product less addictive to minor users by limiting the frequency and duration of access and suspending service during sleeping hours.

299.    At negligible cost, Meta could design software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours; the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide and other forms self-harm among this vulnerable age cohort.

G.    **Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

300.    Meta's product is not reasonably safe as designed because it does not include any safeguards to notify users and their parents of usage that Meta knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable.

301.    It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Meta to design a

product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

302.    Meta's product is not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Meta has not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.

303.    Meta's entire business is premised upon collecting and analyzing user data and it is feasible to use Meta's data and algorithms to identify and restrict improper sexual solicitation, exploitation and abuse by adult users.

304.    Moreover, it is reasonable for parents to expect that platforms such as Instagram, which actively promote its services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

305.    As a proximate result of these dangerous and defective design attributes of Meta's product, A.F. suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Meta's product until late 2021 at the absolute earliest.

306.    As a result of these dangerous and defective design attributes of Meta's product, Plaintiffs M.F. and B.F. suffered emotional distress and pecuniary hardship due to their daughter's mental harms resulting from her social media addiction.

307.    Meta is further liable to Plaintiffs for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram.

**COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)**

308.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 307 as if fully stated herein.

309.    Meta's product is defective because of inadequate instructions or warnings because

the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of A.F.'s injury.

310.   Meta's product is unreasonably dangerous and defective because it contains no warning to users or parents regarding the addictive design and effects of Instagram.

311.   Meta's social media product relies on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

312.   The magnitude of harm from addiction to Meta's product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

313.   The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Meta had actual knowledge of such harms.

314.   Meta's product is unreasonably dangerous because it lacks any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

315.   It is feasible for Meta's product to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better

exercise their rights and responsibilities as parents.

316.    Meta knew about these harms, knew that users and parents would not be able to safely use its product without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

317.    As a result of Meta's failure to warn, A.F. suffered severe mental harm, leading to physical injury from her use of Instagram.

318.    As a result of Meta's failure to warn, Plaintiff M.F. suffered emotional distress and pecuniary hardship due to his daughter's mental harm resulting from social media addiction.

319.    Meta is further liable to Plaintiff for punitive damages based upon its willful and wanton failure to warn of known dangers of its product that was intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram.

## COUNT III – NEGLIGENCE

320.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 319 as if fully stated herein.

321.    At all relevant times, Meta had a duty to exercise reasonable care and caution for the safety of individuals using its product, such as A.F.

322.    Meta owes a heightened duty of care to minor users of its social media product because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

323.    As a product manufacturer marketing and selling products to consumers, Meta owed a duty to exercise ordinary care in the manufacture, marketing, and sale of its product, including a duty to warn minor users and their parents of hazards that Meta knew to be present, but not obvious, to underage users and their parents.

324.    As a business owner, Meta owes its users who visit Meta's social media platform and from whom Meta's derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

325.    Meta was negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like A.F., using its Instagram product.

326.    Meta was negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of its product and levels of problematic use amongst teenage users. Meta has extensive internal research indicating that its product is harmful, causes extensive mental harm and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

327.    Meta is negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use its social media platform and features.

328.    Meta is negligent in failing to fully assess, investigate, and restrict the use of Instagram by adults to sexually solicit, abuse, manipulate, and exploit minor users of its Instagram product.

329.    Meta is negligent in failing to provide users and parents the tools to ensure its social media product is used in a limited and safe manner by underage users.

330.    As a result of Meta's negligence, A.F. suffered severe mental harm from her use of Instagram.

331.    As a result of Meta's negligence, Plaintiffs M.F. and B.F. suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting from social media addiction.

332.    Meta is further liable to Plaintiff for punitive damages based upon its willful and wanton conduct toward underage users, including A.F., whom they knew would be seriously harmed through the use of its social media product.

**COUNT IV – VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof Code §§ 17200, *et seq.*)**

333.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 332 as if fully stated herein.

334.    Defendant Meta is a corporation, and thus a "person," as defined by California Business & Professions Code § 17201.

335.    The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

336.    Defendant's conduct is unlawful as set forth in Counts I–III, above.

337.    Defendant's conduct is unlawful also because it has knowledge of users under the age of 13 on its platform and, in fact, actively targets, markets to, and encourages use of its social media product by minors under the age of 13.

338.    Defendant engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including A.F., while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendant knew and should have known that its statements and omissions regarding the addictive and harmful nature of its product were misleading and therefore likely to deceive the members of the public who use Defendant's product and who permit their underage children to use Defendant's product. Had M.F. or B.F. known of the dangerous nature of Defendant's product, they would have taken early and aggressive steps to stop or limit their daughter's use of Meta's product.

339.    Defendant's practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

340.    Defendant's conduct has resulted in substantial injuries that Plaintiff could not reasonably have avoided because of Defendant's deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

341.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendant has also obtained an unfair advantage over similar businesses that have not engaged in such practices.

342.    As a result of Defendant's UCL violations, Plaintiffs have suffered injury in fact and lost money as set forth herein.

343.    Accordingly, Plaintiffs seek injunctive and equitable relief to halt and remedy Defendant's unlawful, fraudulent, and unfair conduct.

## COUNT V – UNJUST ENRICHMENT

344.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 343 as if fully stated herein.

345.    As a result of Defendant's conduct detailed herein, Defendant received a benefit. Because Defendant's advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram, Defendant benefited directly from A.F.'s problematic use of its product, both from the amount of time she spent on Instagram and from her creation of multiple Instagram accounts.

346.    It would be unjust and inequitable for Defendant to retain the ill-gotten benefits at Plaintiff's expense, in light of Defendant's acts and omissions described herein.

347.    Accordingly, Plaintiffs seek damages in an amount to be proven at trial.

## COUNT VI – INVASION OF PRIVACY

### (California Constitutional Right to Privacy, Cal. Const. Art. 1, § 1)

348.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 347 as if fully stated herein.

349.    Defendant intentionally intruded upon Plaintiffs' solitude, seclusion, or private affairs by knowingly designing its product with features that were intended to, and did, frustrate parents' ability to monitor and control their children's social media usage.

350.    These intrusions are highly offensive to a reasonable person, particularly given Defendant's interference with the fundamental right of parenting and its exploitation of children's special vulnerabilities for commercial gain.

351.    Plaintiffs were harmed by Defendant's invasion of privacy, as detailed herein.

352.    Plaintiffs therefore seek compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendant to cease the harmful practices described throughout this complaint.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Meta for relief as follows:

a)     Past physical and mental pain and suffering of A.F., in an amount to be more readily ascertained at the time and place set for trial.

b)     Loss of future income and earning capacity of A.F.

c)     Past and future medical expenses of A.F.

d)     Past physical and mental pain and suffering of M.F. and B.F., in an amount to be more readily ascertained at the time and place set for trial.

e)     Monetary damages suffered by M.F. and B.F.

f)     Punitive damages.

g)     For the reasonable costs and attorney and expert/consultant fees incurred in this action.

h)     For injunctive relief.

i)     For such other and further relief as this Court deems just and equitable.

Dated: September 29, 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By: _____
   Laura Marquez Garrett, SBN 221542

Laura Marquez Garrett
laura@socialmediavictims.org
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Emanuella J. Paulos, SBN 276638
epaulos@levinlaw.com
LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
BUCHANAN, O'BRIEN, BARR, MOUGEY, P.A.
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Telephone: (850) 435-7000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Matthew Bergman
matt@socialmediavictims.org
Glenn Draper
glenn@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

Robert H. Klonoff
klonoff@usa.net
ROBERT KLONOFF, LLC
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671

Attorneys for Plaintiffs

COMPLAINT

87